COMMONWEALTH EASTERN MORTGAGE COMPANY, Plaintiff and Counterdefendant-Appellee, v. JAMES L. WILLIAMS, Defendant and Counterplaintiff-Appellant.

First District (2nd Division)   No. 86—3546

Opinion filed October 27, 1987.

Martin C. Ashman, Ltd., of Chicago (Martin C. Ashman, Alan L. Meserow, and Michael A. Oppenheimer, of counsel), for appellant.

Walsh, Case, Coale & Brown, of Chicago (Leon E. Lindenbaum and Robert S. Hirschhorn, of counsel), for appellee.

JUSTICE STAMOS delivered the opinion of the court:

In July 1982, the defendant-appellant, James L. Williams (Williams), signed a contract to purchase real estate. The plaintiff-appellee, Jersey Mortgage Company (Jersey), financed $109,000 of the $110,000 purchase price. After several months, Williams defaulted on his mortgage payments. Jersey then filed a complaint against Williams for mortgage foreclosure. Williams filed a two-count counterclaim and affirmative defense; Jersey moved for summary judgment. The trial court granted Jersey's motion for summary judgment on November 20, 1986. On December 22, 1986, Williams filed notice of this appeal. At oral argument, Jersey advised the court that Commonwealth Eastern Mortgage Company had bought out Jersey and that Jersey is now known as the Commonwealth Eastern Mortgage Company. The court then ordered that the caption of this opinion be amended to reflect the change.

In or around July 1982, Williams signed a contract to purchase an eight-unit building located at 5115 South Drexel Avenue in Chicago (the property). The contract contained a financing contingency clause. Williams sought to secure financing from Jersey. Williams dealt with Jersey's agent, Robert Cross (Cross), when Williams applied for the loan. Williams first met Cross at the real estate broker's office, where Cross assisted Williams in completing the loan application. The purchase price of the property was $110,000; Williams put $1,000 down and Jersey financed the additional $109,000.

The next time that Williams met Cross, they were at the Veterans Administration (VA). The VA had agreed to insure the loan for a three-unit, but not for an eight-unit, building. The VA sent Williams a certificate of commitment dated October 1, 1982, regarding the loan. Cross and Williams then had to go to the VA to see if the VA would insure the mortgage at a higher funding because of the money that would be required to convert the eight-unit building into a three-unit building. The VA advised Williams that he had several options. One of the options involved the sellers' escrow. This option did not work. Nevertheless, the VA insured the loan on the condition that Williams would convert the building into three units. It was at this point in time that the issue of additional funding arose. Williams would have to obtain additional financing in order to pay for the construction work necessary to convert the building from eight units to three units.

At the meeting with the VA officer, Cross allegedly told or indicated to Williams "that there should be no problem getting additional funding, securing the business with the second mortgage in order to do the work." During Williams' deposition, the following exchange took place when Williams was questioned as to the alleged additional funding:

"Q. Did he [Cross] give you a specific dollar amount that they would finance you for?

A. I don't recall a specific dollar amount.

Q. Were any terms of that additional refinancing discussed such as, the interest rate?

A. No. That it would be secured by a second mortgage on the property.

Q. Were you told by Mr. Cross specifically what rehabilitation activities that they would extend this credit for?

A. No. We didn't get in to specifics. The whole object of rehabilitation was to meet the VA's approval as a three-flat building.

* * *

Q. Did he [Cross] say that the company would offer you credit or did he say they would assist you in procuring additional credit?

A. The indication was that Jersey Mortgage would furnish the money."

Williams never received anything in writing from Cross in regard to the conversation that they had had about the additional financing. Williams, likewise, did not send anything to Cross indicating that it was Williams' understanding that Jersey was to provide him with additional financing. Williams met Cross at the VA at least one more time "to discuss the loan and find ways of financing—closing on the property." Williams then talked to Cross on the phone regarding the possibilities in terms of financing. In more than one conversation, Cross advised Williams that Williams would be able to get some kind of second mortgage on the property. No specifics on the loan, however, were discussed. Furthermore, Cross and Williams did not talk about an application for this second mortgage "because all of this was conversation basically prior to closing the mortgage so we could find out what we are doing in order to close on the loan."

Before closing on the property, Williams had no idea (no formal estimates) what the rehabilitation costs were going to be. Based on his own experience, Williams felt that the rehabilitation work would require between $70,000 and $100,000. Williams did not tell Jersey

about this estimated price range until after the closing on the property took place.

Just prior to closing on the property, Williams went out to one of Jersey's local offices and signed the loan papers. Williams closed on the property in December of 1982. None of the closing documents discussed anything about additional financing on the property. Williams testified that he signed the mortgage and understood that he was making a mortgage to Jersey. Although Williams admitted that he did not read the mortgage word for word, he stated that the mortgage did not provide for an extension of additional credit. Furthermore, at the time that he signed the mortgage, Williams did not believe that he was borrowing more than the stated $109,000. After closing on the property, Williams acted as his own general contractor and began work on the property. Williams hired subcontractors to perform some of the work.

In January of 1983, Williams began making full monthly mortgage payments to Jersey. On various occasions, Williams tendered late payments. Jersey, however, did not refuse to accept tender of a mortgage payment until Williams had run out of funds and completely discontinued making his mortgage payments. It was not until several months after the closing that Williams contacted Jersey regarding the additional financing. On April 18, 1984, Jersey advised Williams that additional financing would not be forthcoming. Jersey indicated that they did not give rehabilitation loans.

Following the April 18 notification, Williams' correspondence with Jersey involved at least two letters. One letter was dated May 16, 1984, and the other letter was dated May 23, 1984. The May 16 letter, from Williams to Jersey, stated that Williams had received word that Jersey did not make rehabilitation loans. Williams wrote to Jersey that he "thought that the funds needed for rehab of the property could be secured by Jersey as a second mortgage to your existing first mortgage on the property in as much as the refurbished property value would far exceed the mortgages." In its May 23 letter, Jersey first advised Williams that Williams' mortgage had been placed in foreclosure. Jersey also wrote that it did not extend rehabilitation loans or second mortgage loans.

After the April 18 notification, Williams discontinued his rehabilitation work on the property. Williams attempted to get money from other lenders, but was unsuccessful "because of the Jersey Mortgage credit information which shows slow paying on the loan." On May 29, 1984, Jersey filed a complaint for mortgage foreclosure against Williams.

Williams subsequently filed a two-count counterclaim against Jersey, charging Jersey with breach of an oral contract and fraudulent misrepresentation, and an affirmative defense based on the breach of the oral contract claim. Jersey moved for summary judgment on July 30, 1986. On November 3, 1986, Williams filed an affidavit. Although Williams was unable to supply the terms of the alleged additional financing when he gave his deposition in April of 1985, Williams clearly supplied such terms in his November 1986 affidavit. Williams' affidavit stated that: the amount of the mortgage would be "for the amount necessary to do the rehabilitation to a 3-flat building," "the second mortgage would ride along with the first mortgage as to interest and terms of repayment," and the "interest on the second mortgage would be at the V.A. market at that time." Despite Williams' November 3 affidavit, Jersey's motion for summary judgment was granted. On December 22, 1986, Williams filed notice of this appeal.

■ The purpose of summary judgment is not to decide issues of fact but to determine whether any genuine issue of fact exists. (*Kobus v. Formfit Co.* (1966), 35 Ill. 2d 533, 538, 221 N.E.2d 633.) A motion for summary judgment is properly granted if the pleadings, depositions and admissions on file, together with any affidavits and exhibits, when construed strictly against the moving party and liberally in favor of the opponent (*Killeen v. R. W. Dunteman Co.* (1979), 78 Ill. App. 3d 473, 475, 397 N.E.2d 436) show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law (*Fooden v. Board of Governors* (1971), 48 Ill. 2d 580, 586, 272 N.E.2d 497). A court of review will not reverse an order granting summary judgment unless it finds that a material question of fact is present and that the moving party is not entitled to judgment as a matter of law. *Estate of Kern v. Handelsman* (1983), 115 Ill. App. 3d 789, 793, 450 N.E.2d 1286.

■ Furthermore, summary judgment is an appropriate procedure for a court to use in construing the legal principles of a contract. (*Village of Rosemont v. Lentin Lumber Co.* (1986), 144 Ill. App. 3d 651, 659, 494 N.E.2d 592.) In the present case, therefore, summary judgment in favor of Jersey will not be reversed unless a material question of fact exists and Jersey is not entitled to judgment as a matter of law.

■ ■ Williams' affidavit cannot be used to contradict his prior deposition testimony and place material facts in issue. When a party makes admissions which are so "deliberate and unequivocal as to matters within its knowledge," those admissions will conclusively bind that party and that party will be unable to later contradict those ad-

missions. (*Baker-Wendell, Inc. v. Cohon & Associates, Ltd.* (1981), 100 Ill. App. 3d 924, 929, 427 N.E.2d 317.) This rule is well accepted in summary judgment cases. (See *Schmahl v. A.V.C. Enterprises, Inc.* (1986), 148 Ill. App. 3d 324, 499 N.E.2d 572; *Smith v. Ashley* (1975), 29 Ill. App. 3d 932, 332 N.E.2d 32; *Fountaine v. Hadlock* (1971), 132 Ill. App. 2d 343, 270 N.E.2d 222.) The judicial policy behind this rule is that once a party has given sworn testimony, he should not be allowed to commit perjury and change his testimony so as to avoid the consequences of his prior testimony. *Smith v. Ashley* (1975), 29 Ill. App. 3d 932, 935, 332 N.E.2d 32.

In *Schmahl, Smith* and *Fountaine*, one of the parties moved for summary judgment based upon admissions made by the nonmoving party. In each case, the nonmoving party, in an attempt to create an issue of material fact, contradicted its prior admissions via an affidavit. In rejecting the nonmoving party's subsequent affidavit, the trial court, in each instance, granted the moving party's motion for summary judgment. All three cases were affirmed on appeal. On appeal, the reasoning was that in a motion for summary judgment, a party cannot create a genuine issue of material fact by contradicting its prior admissions. *Schmahl v. A.V.C. Enterprises, Inc.* (1986), 148 Ill. App. 3d 324, 331, 499 N.E.2d 572.

In the case at bar, Williams' deposition testimony clearly reveals that the terms of the alleged second mortgage (additional financing) were not discussed. In his deposition, Williams stated that Cross had never indicated what rehabilitation activities Jersey would extend credit for and that Williams never formally obtained an estimate as to how much the costs of the rehabilitation activities would be. Furthermore, Williams also admitted that neither a specific dollar amount nor interest rate was ever discussed. Williams flatly stated that he and Cross never discussed "specifics" in regard to the alleged second mortgage.

On July 30, 1986, Jersey moved for summary judgment on Williams' counterclaim. On November 3, 1986, Williams then filed an affidavit in which he directly contradicted his deposition testimony. In his affidavit, Williams stated what the terms of the second mortgage were to be. Williams stated that: the amount of the loan was to be the "amount necessary to do the rehabilitation to a 3-flat building," the "second mortgage would ride along with the first mortgage as to interest and terms of repayment," and the "interest on the second mortgage would be at the V.A. market at that time."

Williams' deposition testimony reveals that he never discussed any second mortgage terms with Cross. On the contrary, Williams'

subsequent affidavit discloses that the terms were in fact discussed and discloses what the terms of the alleged second mortgage actually were. Under Illinois law, Williams will not be permitted to now create genuine issues of material fact by simply contradicting his prior testimony. This court, therefore, will not consider Williams' November 3 affidavit when reviewing this case.

■■ ■ The alleged oral agreement is unenforceable because its terms are indefinite and uncertain. An alleged agreement will not be held binding and enforceable unless its terms are sufficiently definite and certain. (*Magid Manufacturing Co. v. U.S.D. Corp.* (N.D. Ill. 1987), 654 F. Supp. 325, 332; *In re Kern* (1986), 142 Ill. App. 3d 506, 514, 491 N.E.2d 1275; *Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 937, 445 N.E.2d 901; see also *Wait v. First Midwest Bank* (1986), 142 Ill. App. 3d 703, 708, 491 N.E.2d 795.) In *Magid*, the plaintiff and defendant orally agreed that the defendant would sell the plaintiff certain respirator products. During the conversations that led to the agreement, the parties never discussed or agreed upon certain essential contract terms. The parties never agreed upon the duration or sales quota terms, which the court characterized as the two essential terms of an agreement between a manufacturer and a distributor. The defendant subsequently terminated its relationship with the plaintiff. The plaintiff filed suit and alleged that the defendant had breached its oral contract with the plaintiff. The district court granted the defendant's motion for summary judgment. The court reasoned that under Illinois law, the contract did not contain the essential terms and was therefore unenforceable. *Magid Manufacturing Co. v. U.S.D. Corp.* (N.D. Ill. 1987), 654 F. Supp. 325, 333.

■■ An agreement to loan money in the future is enforceable if the agreement contemplated the terms upon which the future loan would be made. (*McErlean v. Union National Bank* (1980), 90 Ill. App. 3d 1141, 1146, 414 N.E.2d 128.)[1] Examples of such terms include: "the intended duration of the line of credit; the applicable rate of interest to be charged for any loan emanating from such an agreement, or the basis for how such interest would be ascertained; what duration or date or dates were contemplated for maturity of such loans; and what mode or rate of repayment was contemplated." 90 Ill. App. 3d 1141, 1146, 414 N.E.2d 128.

---

[1]*McErlean* did not involve a motion for summary judgment, but rather a motion to dismiss. The plaintiff filed suit against the defendant for breach of an oral and written contract to extend a line of credit. Because the plaintiff did not allege a sufficient number of the terms set forth, the plaintiff's suit was dismissed. The dismissal was affirmed on appeal. 90 Ill. App. 3d 1141, 1149, 414 N.E.2d 128.

■ The burden of proof rests on the party seeking to prove that an oral agreement exists. (*In re Kern* (1986), 142 Ill. App. 3d 506, 514, 491 N.E.2d 1275.) Williams, therefore, must prove that an oral agreement did in fact exist between him and Cross/Jersey. The deposition testimony of Williams, however, does not provide the court with even one of the loan terms that the *McErlean* court set forth.

Williams argues that the essential terms of the second mortgage were given in his sworn affidavit. Williams goes on to cite cases wherein terms (similar to those given in his affidavit) were held to be ascertainable terms, thus rendering the contract itself enforceable. Williams, however, erroneously relies on his affidavit for this information. As established earlier, Williams may not rely on his affidavit to prove the oral agreement. Because the terms of the alleged additional financing are indefinite and uncertain, the alleged oral contract is unenforceable.

■ The parol evidence rule prohibits Williams from introducing evidence of the alleged oral agreement. Under the parol evidence rule, extrinsic evidence of a prior or contemporaneous agreement is not admissible to alter the terms of an instrument that appears complete, certain and unambiguous on its face. (*McKown v. Davis* (1983), 118 Ill. App. 3d 315, 317, 454 N.E.2d 1086.) Williams contends, however, that parol evidence is admissible to show a contemporaneous agreement which is not in conflict with the written agreement and that parol evidence is admissible to show a condition precedent to the formation of a contract.

Williams argues that the facts in this case reveal a contemporaneous oral agreement to loan money in the future that does not vary or contradict the terms of the initial mortgage contract. The terms and conditions of the initial mortgage contract are found in the record. The initial mortgage contract clearly states the interest rate, the amount of the monthly payments, the amount of the loan, and a description of the property, along with numerous other conditions and covenants. No mention is made whatsoever about additional financing or a possible second mortgage. Williams, nevertheless, claims that the contemporaneous oral agreement to loan him between $70,000 and $100,000 would not vary or contradict the terms of the initial mortgage contract. Williams is mistaken. If Jersey were to loan Williams this additional money, the monthly payments, as well as several other terms in the initial mortgage contract, would be varied. Furthermore, Williams' building was appraised at approximately $110,000. If Jersey were to provide the additional financing, Williams' property would not serve as sufficient collateral to back up the loan. This would signifi-

cantly alter Jersey's legal remedies against Williams if Williams were to default on his payments. In sum, the oral agreement would substantially vary and contradict the initial written mortgage contract.

■■ Williams also argues that the oral agreement is admissible to show that the second mortgage was a condition precedent to the formation of the initial mortgage. Although parol evidence is admissible to show that a contract was intended to take effect only upon compliance with a certain condition (*Haas v. Cohen* (1973), 10 Ill. App. 3d 896, 898-99, 295 N.E.2d 28), Williams does not fall within this exception to the parol evidence rule. It is evident from Williams' following deposition statements that obtaining the second mortgage was not a condition precedent to Williams' signing the initial mortgage:

"Q. Did you read the mortgage?

A. Not word for word.

Q. Did you discuss it with an attorney?

A. No, I did not.

Q. For what amount was the mortgage?

A. $109,000.

Q. Did the mortgage provide for an extension of any additional credit?

A. No, it did not.

Q. At the time did you believe that it provided for an extension of additional credit?

A. No, I did not.

Q. Did you believe you were borrowing additional funds which were not stated in the mortgage?

A. No, not by that document.

Q. Did you understand that the lender could foreclose if in fact you failed to meet your obligation under this document?

A. Yes, I did."

The parol evidence rule, therefore, bars Williams from introducing the alleged contemporaneous oral agreement.

■■ Williams is precluded from raising the doctrine of equitable estoppel on appeal. An argument that is presented for the first time on appeal is deemed to be waived. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147, 324 N.E.2d 417; *Sherman v. Board of Fire & Police Commissioners* (1982), 111 Ill. App. 3d 1001, 1008, 445 N.E.2d 1; *Buczkowicz v. Lubin* (1980), 80 Ill. App. 3d 200, 203, 399 N.E.2d 680.) This rule applies even where the appeal is taken from a summary judgment. (*Schuman v. Pekin House Restaurant & Lounge* (1981), 102 Ill. App. 3d 532, 535, 430 N.E.2d 145.) In the instant case, Williams contends that the doctrine of equitable estoppel negates Jer-

sey's Statute of Frauds claim. This is the first time, however, that Williams poses this argument. In his answer to Jersey's motion for summary judgment, Williams did not discuss the doctrine of equitable estoppel. Furthermore, the record does not indicate that Williams raised this theory at any time before appeal. Williams, therefore, is precluded from now raising the doctrine of equitable estoppel for the first time before this court.

■■ Williams does not have a cause of action for fraudulent misrepresentation. In Illinois, the "general rule is that a promise to perform an act, though accompanied at the time with an intention not to perform it, is not such a false representation as will constitute fraud." (*Bank of Lincolnwood v. Comdisco, Inc.* (1982), 111 Ill. App. 3d 822, 828, 444 N.E.2d 657; see also *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 334, 371 N.E.2d 634; *Wilde v. First Federal Savings & Loan Association* (1985), 134 Ill. App. 3d 722, 732, 480 N.E.2d 1236; *Gross Valentino Printing Co. v. Clarke* (1983), 120 Ill. App. 3d 907, 912, 458 N.E.2d 1027; *Ochoa v. Maloney* (1979), 69 Ill. App. 3d 689, 695-96, 387 N.E.2d 852; *Polivka v. Worth Dairy, Inc.* (1974), 26 Ill. App. 3d 961, 965-66, 328 N.E.2d 350; *Metropolitan Sanitary District v. Pontarelli & Sons, Inc.* (1972), 7 Ill. App. 3d 829, 841-42, 288 N.E.2d 905.) In *Polivka*, the defendant allegedly represented to the plaintiff that the defendant would give 50 shares of a new corporation to the plaintiff. The plaintiff never received the shares and sought to sue the defendant in fraud. The court held that the plaintiff did not have an action in fraud. The court reasoned that the "false representation must be one of an existing or past fact, and not a mere promise to do some act in the future." *Polivka v. Worth Dairy, Inc.* (1974), 26 Ill. App. 3d 961, 966, 328 N.E.2d 350.

■■ An exception, however, exists to this general rule: where the "false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud," a claim in fraud is actionable. (*Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 334, 371 N.E.2d 634; see also *Roda v. Berko* (1948), 401 Ill. 335, 81 N.E.2d 912; *Sullivan v. Sullivan* (1967), 79 Ill. App. 2d 194, 223 N.E.2d 461.) Distinguishing between the general rule and the exception to the rule, however, is not an easy task. (*Vance Pearson, Inc. v. Alexander* (1980), 86 Ill. App. 3d 1105, 1112, 408 N.E.2d 782.) Ordinarily, a scheme to defraud occurs when a representation is made with intent to induce a third party to rely on it and the third party relies on it to his detriment. (86 Ill. App. 3d 1105, 1112, 408 N.E.2d 782.) Additionally, to support an action in fraud, the statement (representation) must be certain and definite. (*In re Bower* (1980), 87 Ill.

App. 3d 324, 326, 409 N.E.2d 75.) To fall within the exception, a party must allege sufficient facts from which a scheme can be inferred. *Bank of Lincolnwood v. Comdisco, Inc.* (1982), 111 Ill. App. 3d 822, 829, 444 N.E.2d 657.

In *Bower*, the petitioner sought to vacate a judgment of divorce which incorporated an oral property settlement agreement. The petitioner alleged that the respondent made a fraudulent representation which induced the petitioner to agree to the property settlement. The petitioner claimed that the respondent had "promised to make a will which would provide for Richard Bower" (Richard), their son. In relying on the respondent's promise that she would make adequate financial provisions for Richard, the petitioner entered into the oral property settlement. The respondent did not follow through on her promise. The respondent disinherited Richard and left most of her estate to her brother. The petitioner filed suit. The court held that the petitioner did not have a cause of action in fraud. The court reasoned that the respondent's statement (that she would place Richard in her will) was too indefinite a statement to support an action in fraud. 87 Ill. App. 3d 324, 326, 409 N.E.2d 75.

Williams alleges that Jersey's promise to provide Williams with additional financing constitutes fraud. Jersey, on the other hand, responds that a promise of future conduct does not give rise to an action in fraud. While Jersey cites cases that follow the general rule set forth above, Williams strongly contends that the instant case falls within the "scheme" exception to the general rule. Williams alleges that Jersey's promise to supply additional funding in the future induced him to enter into the mortgage agreement. Williams claims further that the promises were made without the intent to perform.

■■ Williams does not fall within the "scheme" exception for at least two reasons. First, Jersey's alleged representation to loan money in the future was too indefinite a statement to support an action in fraud. Williams admits, in his deposition, that no specifics regarding future financial advancements were ever discussed. Second, no evidence exists to substantiate Williams' allegation that the promise of additional financing induced him to enter into the initial mortgage contract. Williams' deposition testimony and the May 16 letter reveal that Williams never really expected to receive additional financing from Jersey. The evidence shows that it was only after Williams began experiencing financial troubles that it occurred to him that he might be able to get more financing from Jersey. Williams, therefore, does not have a cause of action for fraudulent misrepresentation.

In view of the foregoing, the judgment of the circuit court of Cook County is hereby affirmed.

Affirmed.

HARTMAN and BILANDIC, JJ., concur.