LOVEJOY ELECTRONICS, INC.,
Plaintiff-Appellant,
Cross-Appellee,

v.

Gerald N. O'BERTO,
Defendant-Appellee,
Cross-Appellant.

Nos. 87-2068, 88-1194 and 88-1269.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 8, 1989.

Decided April 27, 1989.

Ronald P. Kane, Siegan, Barbakoff & Gomberg, Chicago, Ill., for plaintiff-appellant, cross-appellee.

H. Carl Runge, Jr., Runge & Gumbel, P.C., Collinsville, Ill., for defendant-appellee, cross-appellant.

Before WOOD, Jr., POSNER, and COFFEY, Circuit Judges.

POSNER, Circuit Judge.

This case arises out of a dispute between an inventor and a family-owned corporation that makes electronic equipment. Federal jurisdiction is based on diversity of citizenship, and the parties agree that Illinois law governs the substantive (and, as it turns out, one of the procedural) issues.

Gerald O'Berto began to work for Lovejoy Electronics in 1969. He never had a formal employment agreement, but by 1977 the company was styling him a "vice president" in its internal documents and authorizing him to so represent himself to customers and suppliers, although the firm never formally appointed him an officer. In 1980, O'Berto signed the Consulting Agreement with Lovejoy that is the focus of the dispute. The agreement described O'Berto as an independent contractor (yet he would continue to be styled a vice president until the company fired him in 1983), and said he would receive specified royalties and other compensation in exchange for services provided and products invented for Lovejoy. O'Berto agreed to give Lovejoy the "majority" of his time and the first call on his services, to refrain from competing with Lovejoy in specified product areas, and to sell Lovejoy its entire requirements of a particular computer chip at a price not to exceed O'Berto's cost of procurement.

A month after signing the agreement O'Berto entered into a contract with the chip's supplier. The contract required the supplier to charge Lovejoy a price that would include a royalty for O'Berto. Although the contract described the royalty as a fee for testing the chip, all of it (so far as appears) represented a kickback to O'Berto rather than reimbursement of any testing expense. Lovejoy was not told about this side agreement; it thought it was buying the chip at O'Berto's cost.

Six weeks after O'Berto made this unauthorized side agreement—which is to say, ten weeks after the signing of the Consulting Agreement—Lovejoy signed a contract to sell certain technology to J.H. Fenner & Co., an English firm. The contract stated that O'Berto would provide certain services to Fenner and in exchange Fenner would pay royalties of $200,000 to Lovejoy that Lovejoy would turn over to O'Berto. Before O'Berto signed the Consulting Agreement, Lovejoy's chief executive, Pat Hennessy, had shown him a draft of the Fenner contract that contained a provision whereby O'Berto would for three years receive an additional $20,000 annual consulting fee from Fenner for his services in connection

with the contract; but this provision was omitted from the Fenner contract as actually executed. O'Berto was unhappy when he found out about the omission and Lovejoy was unhappy when it discovered O'Berto's secret side agreement with the supplier of the chip. The relationship between O'Berto and Lovejoy deteriorated, and there was a final parting of the ways in 1983.

In 1984 Lovejoy sued O'Berto for the profits he had obtained from the side agreement, and O'Berto counterclaimed. In part the counterclaim alleges a simple breach of contract consisting of Lovejoy's failure to pay O'Berto all the royalties due him under the Consulting Agreement. Lovejoy does not contest its liability for this breach, and raises only trivial objections, unnecessary to discuss, to the computation of damages. More interesting, the counterclaim also charges that O'Berto was induced to sign the Consulting Agreement by a fraud that consisted of Pat Hennessy's falsely promising him that the deal with Fenner would generate $200,000 in royalties for O'Berto (royalties that were never paid, although duly provided for in the Fenner contract), plus the $60,000 in consulting fees that also were never paid, having been dropped from the Fenner contract before it was signed.

After the district court denied Lovejoy's motion for summary judgment, 616 F.Supp. 1464 (N.D.Ill.1985), the case was tried to a jury. On O'Berto's claim against Lovejoy, the jury found fraud as well as breach of contract and went on to compute O'Berto's damages at $410,678, of which $200,000 represented the unpaid royalties under the Fenner contract and the balance unpaid royalties under the Consulting Agreement itself. (Oddly, O'Berto had not sought damages for the loss of the annual consulting fee that the Fenner contract was supposed to provide for.) The jury deducted from the award, however, the more than $60,000 in kickbacks that O'Berto had received from the supplier of the chip. The judge awarded prejudgment interest to both parties.

Both appeal. Lovejoy challenges the verdict on liability for fraud, the damages award, and the award of prejudgment interest on O'Berto's damages, while O'Berto argues that the judge should not have awarded Lovejoy prejudgment interest on O'Berto's profits from his side agreement.

■ Lovejoy's first argument is that the admission of O'Berto's testimony about what Pat Hennessy told him in order to induce him to sign the Consulting Agreement, together with the admission (to corroborate O'Berto's testimony) of a draft of the Fenner contract that contained the provision for the $20,000 annual consulting fee for O'Berto for three years, violated the parol evidence rule. It does *look* like a case in which a party is seeking to vary the terms of a written contract, but the appearance is misleading. O'Berto does not argue that the Consulting Agreement should be construed as having incorporated the Fenner contract. He argues that he was induced to sign the Consulting Agreement by Pat Hennessy's promise that another contract would be made to which he would not be a direct party but of which he would be a third-party beneficiary—the contract between Lovejoy and Fenner—and which would contain terms particularly favorable to him. He is not, so far as the $200,000 in royalties is concerned, suing to enforce the Consulting Agreement at all, let alone the Consulting Agreement as varied by oral or other understandings within the bar of the parol evidence rule. He is suing to obtain the benefits that (he claims) Hennessy promised him, if only he would sign the Consulting Agreement, as he duly did. Lovejoy's counsel conceded at argument that Lovejoy needed to "lock in" O'Berto to a consulting relationship with the company in order to be able to go forward with the Fenner contract and other promising opportunities, and the concession is supported by the fact that Fenner conditioned the contract on Lovejoy's providing O'Berto to provide the services for which Fenner agreed to pay the $200,000 in royalties.

■ Against such a claim the parol evidence rule provides no defense. That is not to say the claim is necessarily a valid

one. What O'Berto calls fraud looks to us more like promissory estoppel, especially when we consider the nature of the relief sought, which implies that O'Berto is seeking to enforce the promise that he would get $200,000 out of the Fenner deal if he signed the Consulting Agreement, thereby locking himself into Lovejoy's service and enabling Lovejoy to go ahead with the deal. (On such a theory it would be irrelevant whether the promise was a lie—i.e., whether Hennessy had no intention of keeping it. That of course is a vital issue in a fraud case.) But Lovejoy does not argue that O'Berto has failed to state a claim of fraud, only that certain evidence should not have been admitted in support of it. There are, in fact, plenty of cases in Illinois and elsewhere that uphold liability for promissory fraud—that is, for making a promise intending not to keep it—and that confirm the unavailability of the parol evidence rule as a defense to it. See, e.g., *Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 333–34, 13 Ill.Dec. 699, 707, 371 N.E.2d 634, 641 (1977); *Shanahan v. Schindler,* 63 Ill.App. 3d 82, 93–95, 379 N.E.2d 1307, 1316–17 (1978); Farnsworth, Contracts 253, 465 (1982); and the district judge's discussion of the issue in his ruling on summary judgment, 616 F.Supp. at 1468–69. True, the cases often preface their discussion of the issue by saying that "Illinois does not allow a recovery for promissory fraud," but then they explain that there is an exception "if the promise is part of a scheme employed to accomplish the fraud," and that the exception has swallowed the rule. *Stamatakis Industries, Inc. v. King,* 165 Ill.App. 3d 879, 881–84, 520 N.E.2d 770, 772–73 (1987); see also *Commonwealth Eastern Mortgage Co. v. Williams,* 163 Ill.App.3d 103, 113–14, 114 Ill.Dec. 360, 366–67, 516 N.E.2d 515, 521–22 (1987). And true, O'Berto made no effort to prove up the damages *caused by the fraud.* That is, he made no effort to establish the position he would have occupied had there been no fraud and compare that to the position he did occupy. Maybe if Hennessy hadn't promised him the special benefits from the Fenner deal, O'Berto would have severed his connections with Lovejoy then and

there—and who knows whether he would have been better off or worse off doing so. But while complaining about the damages on other grounds, Lovejoy does not complain about a mismatch between the theory of liability and the theory underlying the damages award. Any such complaint is therefore forfeited, and we need not consider its potential merit.

Lovejoy does, however, argue that O'Berto's testimony about his conversation with Hennessy—the key evidence of the alleged fraud—should have been excluded under the Illinois "dead man" statute. Although as a general rule federal rather than state law governs the admissibility of evidence in federal diversity cases, see, e.g., *In re Air Crash Disaster Near Chicago*, 701 F.2d 1189, 1193 (7th Cir.1983); *Flaminio v. Honda Motor Co.*, 733 F.2d 463, 470–71 (7th Cir.1984); *Romine v. Parman*, 831 F.2d 944 (10th Cir.1987), there are a number of express exceptions, see Fed.R.Evid. 302 (presumptions), 501 (privileges), 601 (competency of witnesses), as well as substantive rules masquerading as evidence rules, such as the parol evidence rule itself. The pertinent exception here is the one in Rule 601. The rule sweeps away the traditional objections to competency of witnesses, but with the following exception: in civil cases, "with respect to an element of a claim or defense as to which State law supplies the rule of decision, the competency of a witness shall be determined in accordance with State law." The legislative history of Rule 601 reveals that the purpose of this exception was, precisely, to preserve state dead man's laws in cases such as this where state law supplies the rule of decision. See H.R.Rep. No. 650, 93d Cong., 1st Sess. 9 (1973).

So far as relevant here, the Illinois dead man's statute forbids a party to a suit by or against a firm to testify about any conversation with a dead agent of the firm, unless a living agent of the firm was also present at the conversation (to testify as the dead man himself might have testified to what was said). (Ill.Rev.Stat. ch. 110, ¶ 8–301. The statute refers only to "partners" and "joint contractors," and not to agents save as they may have contracted with the party; but its application to corporate agents without this qualification was assumed in *Golen v. Chamberlain Mfg. Corp.*, 139 Ill.App.3d 53, 59–60, 93 Ill.Dec. 677, 682, 487 N.E.2d 121, 126 (1985) (but see *Sohigro Service Co. v. Industrial Comm'n*, 172 Ill.App.3d 47, 57, 122 Ill.Dec. 424, 434, 526 N.E.2d 683, 689 (1988)), and is not contested by O'Berto. Anyway, this may be a case of an agent who contracted with a party—for Pat Hennessy did execute a contract on Lovejoy's behalf with O'Berto, even though this suit is not for a breach of contract based on Hennessy's promises.

O'Berto testified that Michael Hennessy, Pat's son and his successor as chief executive of Lovejoy, was present when Pat promised O'Berto that the Fenner contract would contain royalty and consulting provisions favorable to him; and if so this took Pat's statements out of the dead man's statute. Lovejoy argues that O'Berto's deposition concedes that no third person was present and that O'Berto should not have been permitted to retract the concession at trial. Although as we have said the Illinois dead man's statute is applicable to this federal diversity case, the question whether a party to such a case should be allowed to retract an admission is not a question under that statute; it is a question of federal procedural law. And we have answered it by ruling that "a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir.1987); see also *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir. 1988); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986). The broader principle is that a party is entitled to summary judgment if his opponent cannot produce materials of evidentiary quality demonstrating the existence of a triable issue. See Fed.R. Civ.P. 56(c), (e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *American Nurses' Ass'n v. Illi-*

*nois,* 783 F.2d 716, 729–30 (7th Cir.1986). So if Lovejoy had demonstrated in its motion for summary judgment that the only evidence of fraud was a statement inadmissible under Illinois' dead man statute because O'Berto's own deposition showed that it was inadmissible and there was no contrary evidence, Lovejoy would have been entitled to summary judgment.

But O'Berto's deposition is ambiguous. Cf. *Young v. Pease,* 114 Ill.App.3d 120, 69 Ill.Dec. 868, 448 N.E.2d 586 (1983). It can be read to say only that no third person was present at an *earlier* conversation, about which O'Berto did not testify at trial. For in response to the question "When, if ever, did Pat Hennessy tell you that the Fenner contract would provide for $20,000 a year for the next three years?" O'Berto had replied in the deposition, "Around the time that Pat and I first went over the initial draft"—and it was in reply to a follow-up question about *this* conversation that O'Berto said he didn't believe anyone else had been present. If the first question is interpreted as asking O'Berto to specify every conversation in which the subject of the $20,000 annual consulting fee was discussed and the answer as acknowledging that there was but a single conversation and no third person was present, O'Berto is sunk. And maybe this is the correct interpretation of the interchange. But it is not the only possible interpretation, and the district judge was entitled to find that O'Berto had not meant to rule out subsequent conversations about the $20,000 at which Michael Hennessy may have been present.

Next Lovejoy complains that the judge should not have granted O'Berto's motion for a directed verdict on Lovejoy's claim that O'Berto had breached his fiduciary obligations as a corporate officer by accepting kickbacks from the chip supplier. The judge's ground was that O'Berto, as a mere independent contractor, owed no fiduciary obligation to Lovejoy. The parties agree that a corporate officer is a fiduciary of his corporation. And Lovejoy argues that O'Berto was a vice president, and therefore a corporate officer. The "therefore" puzzles us. The corporation law of Illinois provides for corporate officers, see Ill.Rev.Stat. ch. 32, ¶ 8.50, but leaves it to each corporation to decide what to call them. Lovejoy stresses O'Berto's apparent authority, but that is irrelevant. The corporation did represent O'Berto to the world as an officer, and this bound it in its dealings with the world. See, e.g., *Levin v. 37th Street Drug & Liquors, Inc.,* 103 Ill.App.2d 248, 243 N.E.2d 504 (1968). But both Lovejoy and O'Berto knew the truth— that he was an independent contractor— and this knowledge is controlling in a suit between them. In any event the relevance of the fiduciary issue eludes us. The only relief Lovejoy sought for the breach of the alleged fiduciary obligation was the return of the profits that O'Berto had made from the breach, and the jury awarded Lovejoy those profits—so the directed verdict cost it nothing. It would have cost it something if the jury, having decided that the Consulting Agreement, which required O'Berto to sell the chip to Lovejoy at his cost, was void because procured by fraud, had relieved O'Berto of his obligations under it. But the jury did not do this, and if its action was illogical—which it was—it is not an illogicality of which Lovejoy can or does complain.

Lovejoy's next contention is that O'Berto is the author of the loss of the $200,000 in royalties. The reason, Lovejoy argues, that Fenner backed out of the agreement was that O'Berto refused to provide the services that Fenner's contract with Lovejoy required him to provide. While conceding that he had a duty to mitigate his damages, O'Berto claims, with considerable support in the record, that he was not told his services were required for the Fenner contract until after Lovejoy had both fired him and sued him. To this Lovejoy replies that the requirement was in all the versions of the Fenner contract, including the draft that Hennessy showed O'Berto. The jury found for O'Berto under correct instructions, and the evidence was not so one-sided in Lovejoy's favor that we can say that no reasonable jury would have ruled for O'Berto.

 The only remaining question that warrants discussion—and that briefly —is the award of prejudgment interest to both parties. So far as the unpaid royalties are concerned, there is no problem; an Illinois statute provides for prejudgment interest on moneys due on a written contract. Ill.Rev.Stat. ch. 17, ¶ 6402. The statute says nothing about fraud, however, and the Illinois courts, as we explained in *Needham v. White Laboratories, Inc.*, 847 F.2d 355, 362 (7th Cir.1988), are reluctant to go beyond the statute. But there is a reasonably well established exception to this judicial modesty, precisely for cases of fraud, where the tradition of awarding prejudgment interest predates the statute and has been held to have survived its enactment. See, e.g., *612 North Michigan Ave. Bldg. Corp. v. Factsystem, Inc.*, 54 Ill. App.3d 749, 754–55, 12 Ill.Dec. 613, 618, 370 N.E.2d 236, 241 (1977). "Fraud" describes not only Lovejoy's promissory fraud but also O'Berto's profit on the secret side agreement with the chip supplier. Whether or not O'Berto breached a fiduciary obligation, he broke his contract in a fraudulent manner, and that is enough. That Lovejoy had failed to ask for prejudgment interest on its claim—the judge deducted Lovejoy's prejudgment interest from the prejudgment interest that he awarded O'Berto—is not, as O'Berto argues, an error. Ours remains an adversarial system, and if O'Berto had been harmed by Lovejoy's oversight the judge could not have corrected it. But within the limits of an adversarial system our judges have a responsibility to do justice insofar as they can (a point recognized at places even in the Federal Rules of Civil Procedure—see, e.g., Fed.R.Civ.P. 54(c)), and when they can do it without unjustifiable harm to one of the adversaries they should be commended rather than reversed. Cf. *Kaszuk v. Bakery & Confectionery Union*, 791 F.2d 548, 559 (7th Cir.1986) (per curiam); *Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321, 1335 (7th Cir.1987). So we have previously held with specific reference to prejudgment interest. See *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1298 (7th Cir. 1987).

The other points raised on appeal are trivial. We find no error in the conduct of the proceedings, and the judgment is therefore

Affirmed.