# Illinois Official Reports

## Appellate Court

---

### *In re Estate of Ivy*, 2019 IL App (1st) 181691

---

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF MARJORIE IVY, Deceased (Christopher Ivy, Independent Administrator, Petitioner-Appellee, v. Mordechai Faskowitz, Respondent-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-18-1691 |
| Filed | June 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-P-2200; the Hon. Karen O'Malley, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Miriam F. Solo, of Chicago, for appellant.<br><br>James R. Carey, Robin D. Maher, and Daniel T. Paluga, of Levin Schreder & Carey, Ltd., of Chicago, for appellee. |
| Panel | JUSTICE HOWSE delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1    The issue presented in this case is whether a person charged with first degree murder of a decedent and found not guilty by reason of insanity (NGRI) is barred by collateral estoppel from contesting that he "intentionally and unjustifiably" caused decedent's death under section 2-6 of the Probate Act of 1975, commonly known as the Slayer Statute (755 ILCS 5/2-6 (West 2012)). The Cook County probate court granted petitioner's motion for summary judgment, ruling that the criminal court's NGRI finding on two counts of first degree murder acts, by way of collateral estoppel, to establish that respondent "intentionally and unjustifiably" caused Marjorie Ivy's (Decedent) death, thereby prohibiting him from receiving from Decedent's estate under the Slayer Statute.

¶ 2    For the following reasons we reverse.

**BACKGROUND**

*Relevant History Antecedent the Probate Proceeding at Issue*

¶ 5    On June 7, 2016, respondent Mordechai Faskowitz was found NGRI for the death of his girlfriend of 32 years. The events leading up to Decedent's death are as follows.

¶ 6    Throughout respondent and Decedent's relationship, respondent suffered from schizophrenia, which had been controlled by medication until June 2013 when respondent stopped receiving his psychiatric medication. The pharmacy was unable to read the handwriting on his prescription, and despite efforts by respondent and others to obtain a new prescription, respondent was without medication until August 2013. Without his medication, respondent's mental health substantially deteriorated. Respondent believed he was in danger of being murdered by skinheads, Nazis, and the Mafia because God had chosen him to help and protect the helpless and homeless. He believed that Decedent wanted to kill him because she was the leader of the skinheads and Satan. At one time, respondent began eating raw rats believing it would spread a plague among evil doers. On September 12, 2013, respondent was arrested by the Chicago Police Department after he attacked a man walking a pit bull, believing the man was a skinhead stalking him. Respondent was placed in the psychiatric ward at MacNeal Hospital, where he attacked two people and was considered a danger to others. Despite the danger documented at MacNeal, on September 27, 2013, respondent was released without medication because he told a doctor that he would not attack anyone if no one attacked him.

¶ 7    On October 9, 2013, respondent went to Decedent's home with a knife that he had brought from his residence. He entered Decedent's home, called her a monster, threw her on the floor, and killed her by stabbing her more than 40 times with the knife. Respondent was arrested in connection with Decedent's death and charged with (1) one count of first degree murder pursuant to section 9-1(a)(1) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/9-1(a)(1) (West 2012)), (2) one count of first degree murder pursuant to section 9-1(a)(2) of the Criminal Code (*id.* § 9-1(a)(2)), and (3) one count of concealment of a homicidal death (*id.* § 9-3.4(a)).

¶ 8                                        Criminal Trial

¶ 9        At his criminal trial, respondent asserted an insanity defense. During the trial, defense's expert, Dr. Roni Seltzberg, opined that, within a reasonable degree of medical and psychiatric certainty, respondent was suffering from acute psychotic mental illness, specifically, schizophrenia, at the time he killed Decedent, which impaired his judgment to the extent that he was not able to appreciate the criminality of his conduct. Dr. Seltzberg testified that respondent felt he had to kill Decedent because she was evil and trying to kill him, Orthodox Jews, homeless people, and others and God was directing him to do this because it was the right thing to do.

¶ 10       Dr. Christina Floreani's testimony was offered by stipulation. Dr. Floreani opined that respondent was legally insane at the time he killed Decedent and was suffering from a mental disease and/or defect that resulted in a substantial lack of capacity to appreciate the criminality of his conduct. She reported that when respondent was at MacNeal in September 2013 he was very psychotic, aggressive, delusional, and not adherent to his medication and was discharged without any psychotropic medication. She reported that respondent told her that at the point when he killed Decedent he "was already thinking that there were these people running around like demons, posing as people, and [he] thought Decedent might be one of these demons."

¶ 11       Dr. Kristin Schoenback's testimony was also admitted by stipulation. Dr. Schoenback opined that to a reasonable degree of psychological and scientific certainty respondent was legally insane at the time of the offense and as a result lacked substantial capacity to appreciate the criminality of his conduct.

¶ 12       At the conclusion of the criminal trial, respondent was found not guilty on all counts by reason of insanity. During its ruling, the criminal trial judge made the following statements:

    "This case certainly is a tragedy. There's no question about it. As an aside, I guess it is not really relevant to my finding, but I sure hope someone is suing the c*** out of MacNeal Hospital. It seems like this could have been prevented. It is a horrible tragedy *** three experts telling us that Mr. Faskowitz was insane at the time, the system failed him, specifically, MacNeal Hospital failed him by sending him out without any medication and thinking that, that was just fine. I do find him not guilty by reason of insanity NGRI. *** I am finding him the same on all three counts not guilty by reason of insanity."


¶ 13                          Procedural Posture in Probate Proceedings

¶ 14       Decedent died intestate leaving certain assets of which respondent was named beneficiary including an individual retirement account, an annuity, two investment accounts, and the "Mordechai Faskowitz Supplemental Care Trust." On August 1, 2016, petitioner Christopher Ivy, Decedent's nephew and independent administrator of Decedent's estate, filed a "Petition to Disqualify Mordechai Faskowitz From Receiving Benefits Under the Slayer Statute and Distribute Assets to Successor Beneficiaries to the Estate of Marjorie G. Ivy," which was subsequently amended on August 25, 2016 (Amended Petition). The Amended Petition and related filings seek to disqualify respondent from receiving benefits from Decedent's estate for reasons to include the Slayer Statute (755 ILCS 5/2-6 (West 2012)) because respondent "intentionally and unjustifiably" caused Decedent's death. The Slayer Statute prevents a person who intentionally and unjustifiably kills a decedent from receiving property from the decedent through inheritance laws or otherwise and states in relevant part as follows:

"*A person who intentionally and unjustifiably causes the death of another* shall not receive any property, benefit, or other interest by reason of the death, whether as heir, legatee, beneficiary, joint tenant, survivor, appointee or in any other capacity and whether the property, benefit, or other interest passes pursuant to any form of title registration, testamentary or nontestamentary instrument, intestacy, renunciation, or any other circumstance. The property, benefit, or other interest shall pass as if the person causing the death died before the decedent, provided that with respect to joint tenancy property the interest possessed prior to the death by the person causing the death shall not be diminished by the application of this Section. A determination under this Section may be made by any court of competent jurisdiction separate and apart from any criminal proceeding arising from the death, provided that no such civil proceeding shall proceed to trial nor shall the person be required to submit to discovery in such civil proceeding until such time as any criminal proceeding has been finally determined by the trial court or, in the event no criminal charge has been brought, prior to one year after the date of death. *A person convicted of first degree murder or second degree murder of the decedent is conclusively presumed to have caused the death intentionally and unjustifiably for purposes of this Section.*" (Emphases added.) *Id.*

¶ 15 Respondent, through his agent pursuant to power of attorney, filed an answer to the Amended Petition on September 8, 2016.

¶ 16 On September 14, 2016, petitioner filed a reply to respondent's answer and motion for judgment on the pleadings pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2016)) arguing that as a matter of law respondent should be deemed to have predeceased Decedent under the Slayer Statute. Following a hearing on petitioner's section 2-615 motion, the trial court denied the motion, finding:

"only where a person is convicted of murdering the decedent in the first or second degree is it necessarily the case that he or she has also 'intentionally and justifiably' [*sic*] caused the death of the decedent for purposes of the Slayer Statute. [Citation.] In all other circumstances, including the instant one, a court must make the determination on the particular facts of the case—'separate and apart from [the] criminal proceeding arising from the death ***.' "

The trial court further found that "whether Faskowitz 'intentionally and unjustifiably' caused the death of Decedent remains a question of material fact that may not be resolved on the pleadings; as such, Respondent is entitled to a hearing on the same."

¶ 17 Thereafter, discovery was undertaken to include the deposition of Dr. Seltzberg wherein she recounted statements made to her by respondent as follows: that he brought the knife that he used to kill Decedent from his home and let himself into Decedent's home; that he stabbed Decedent repeatedly and cut her neck to make sure she was dead; that prior to the day he killed Decedent, respondent thought about killing her; that he killed Decedent because he believed that he received a sign from the Lord that killing Decedent was the right thing to do; that he killed Decedent believing God wanted him to because Decedent was making his life not worth living and because she was teaching skinheads to kill Orthodox Jews; that he killed Decedent because he thought she was the leading skinhead and that she was trying to have him killed because he recognized a gay rabbi; and that he believed when he heard the air conditioning go on while killing Decedent it was a message from God that what he was doing was right and he was basically saving the world.

¶ 18 On October 25, 2017, petitioner filed a motion for summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (*id.* § 2-1005). A response was filed on respondent's behalf on December 7, 2017.

¶ 19 On June 22, 2018, the probate court entered an order granting petitioner's summary judgment motion. In its order, the probate court noted that Illinois Rule of Evidence 201 (eff. Jan. 1, 2011) allowed the court to take judicial notice of two facts. The first fact was that respondent was charged in the prior criminal case with two counts of first degree murder pursuant to sections 9-1(a)(1) and 9-1(a)(2) of the Criminal Code and one count of concealment of homicide pursuant to section 9-3.4(a) of the Criminal Code. The second fact the court took judicial notice of was the criminal trial judge's adjudication of respondent as NGRI on all three counts.

¶ 20 The trial court set forth the language in section 9-1(a) of the Criminal Code, which states that:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another ***." 720 ILCS 5/9-1(a)(1), (2) (West 2012).

¶ 21 The probate court noted that for the criminal trial judge to find respondent NGRI on each count of first degree murder, the prosecution had to prove every element of the offenses beyond a reasonable doubt. In finding respondent NGRI, the criminal trial judge made a determination as to respondent's mental state in the criminal proceeding, which the trial court concluded constituted an adjudication sufficient to satisfy the Slayer Statute's requirement that respondent "intentionally and unjustifiably" caused Decedent's death. The probate court further concluded that there was a final judgment on the merits in the criminal litigation to which respondent was a party and that respondent had a full and fair opportunity to litigate all the relevant issues in the criminal trial. Accordingly, the probate court found that collateral estoppel applied to bar respondent from relitigating the issue of whether he intentionally and unjustifiably caused Decedent's death, thus preventing respondent from inheriting from Decedent's estate under the Slayer Statute. The probate court entered summary judgment in favor of petitioner.

¶ 22 Respondent timely appealed pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. Mar. 8, 2016).

¶ 23 This appeal followed.

¶ 24 ANALYSIS

¶ 25 On appeal, respondent argues that the trial court erred in applying the doctrine of collateral estoppel to find that a NGRI verdict against a defendant effectively creates an irrebuttable presumption that the defendant is barred from taking as a beneficiary of a decedent under the Slayer Statute. In support of his position, respondent argues that (1) the plain language of the statute limits an irrebuttable presumption of intentionally and unjustifiably causing death only to convictions of first or second degree murder, (2) the Illinois legislature did not intend for a finding of NGRI to be an automatic bar to taking under the Slayer Statute, (3) the trial court's

application of the doctrine of collateral estoppel was misplaced, and (4) public policy dictates against punishing an individual found to be NGRI.

In response, petitioner argues that (1) the trial court correctly found respondent intentionally and unjustifiably caused Decedent's death, preventing him from receiving under the Slayer Statute because (a) collateral estoppel applies as a bar to relitigation of the issues of respondent's "intent and justification," those issues having been resolved in the criminal trial; (b) public policy does not prohibit application of the Slayer Statute to persons found NGRI; and (c) the Slayer Statute does not require a separate hearing. Petitioner further argues that (2) the Slayer Statute should be interpreted as a *per se* bar against persons found NGRI from receiving from their victims. In the alternative, petitioner argues that, (3) even if collateral estoppel does not apply, the undisputed facts in this matter demonstrate that respondent's actions in killing Decedent were intentional and unjustifiable under the Slayer Statute.

## Standard of Review

The parties dispute the applicable standard of review in this matter. Respondent argues that the standard of review is *de novo*, while petitioner posits that a mixed standard is appropriate. In general, the Illinois Supreme Court has stated that we review *de novo* the applicability of the collateral estoppel doctrine as a question of law. *In re A.W.*, 231 Ill. 2d 92, 99 (2008). However, once the trial court has determined that the threshold requirements for collateral estoppel have been met, similar to judicial estoppel, the trial court must determine whether to apply the doctrine and has broad discretion, particularly in cases of nonmutual offensive collateral estoppel as was employed in this case. See *Illinois Health Maintenance Organization Guaranty Ass'n v. Department of Insurance*, 372 Ill. App. 3d 24, 46-47 (2007). This determination requires an exercise of discretion and is reviewed for abuse of discretion. *Seymour v. Collins*, 2015 IL 118432, ¶ 48.

However, as our supreme court has recently stated in *Seymour*, "where the exercise of that discretion results in the termination of the litigation, and that result is brought about via the procedural mechanism of a motion for summary judgment, it follows, as well, that we review that ruling *de novo*." *Id.* ¶ 49. For summary judgment to apply there must be no genuine issues of material fact, nor could a reasonable person draw divergent inferences from the undisputed facts. *Id.* We construe the record strictly against the movant and liberally in favor of the nonmoving party. *Id.*

## A Finding of NGRI on a Charge of First Degree Murder Does Not Create an Irrebuttable Presumption Under the Slayer Statute

Having determined the applicable standard of review, we next turn to a potentially determinative question on appeal—specifically, whether an adjudication of NGRI of first degree murder creates an irrebuttable presumption under the Slayer Statute of intentionally and unjustifiably causing death where the statute provides that a person convicted of first or second degree murder is conclusively presumed to have caused the death intentionally and unjustifiably and is therefore barred from receiving from the decedent. This question arises because a person who is adjudicated NGRI, while found not guilty of the underlying charge, must have been found by the trier of fact to have committed each element of the charged offense beyond a reasonable doubt. 720 ILCS 5/6-2(e) (West 2012). Accordingly, where there is an adjudication of NGRI on a charge of first degree murder, the trier of fact necessarily will

have found that the defendant committed each element of first degree murder beyond a reasonable doubt. The question for this court is, if under the Slayer Statute a conviction of first degree murder creates an irrebuttable presumption that the convicted person "caused the death intentionally and unjustifiably," should it then follow that the same irrebuttable presumption should apply to someone, not convicted but adjudicated NGRI of first degree murder, having been found beyond a reasonable doubt to have committed all of the elements of the crime? Guided by well-established rules of statutory construction, we answer this question in the negative.

¶ 32    We review issues of statutory construction *de novo*. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 6 (2009). The fundamental rule in construing a statute is to ascertain and give effect to the legislature's intent. *Id.* The best indicator of the legislature's intent is the language of the statute, which must be accorded its plain and ordinary meaning. *Id.* A statute should be read as a whole and construed so that no word, phrase, or section is rendered meaningless or superfluous, and we must not depart from the statute's plain language by reading into it exceptions, limitations, or conditions the legislature did not express. *People v. Ellis*, 199 Ill. 2d 28, 39 (2002). When the language in the statute is clear and unambiguous, the court will apply the statute as written without resort to extrinsic aids of statutory construction. *Landis*, 235 Ill. 2d at 6-7. We are not at liberty to enlarge the scope of a plain provision in order to more effectively accomplish the general purpose of the statute. *Berwyn Lumber Co. v. Korshak*, 34 Ill. 2d 320, 323 (1966); *In re Estate of Buehnemann*, 25 Ill. App. 3d 1003, 1006 (1975).

¶ 33    As noted above, the Slayer Statute carves out only two specific instances where a person is conclusively presumed to have caused the decedent's death intentionally and unjustifiably and is therefore barred from receiving from the decedent. Both instances require a conviction. The statute states in pertinent part as follows:

> "A person *convicted* of first degree murder or second degree murder of the decedent is conclusively presumed to have caused the death intentionally and unjustifiably for purposes of this Section." (Emphasis added.) 755 ILCS 5/2-6 (West 2012).

¶ 34    Here the plain language of the Slayer Statute is clear. Only a person "*convicted* of first degree murder or second degree murder of the decedent is conclusively presumed to have caused the death intentionally and unjustifiably." (Emphasis added.) *Id.* Undefined words in a statute must be ascribed their ordinary and popularly understood meaning. *People ex rel. Department of Public Aid v. Smith*, 212 Ill. 2d 389, 397 (2004). "Conviction" is defined as "[t]he act or process of judicially finding someone guilty of a crime; the state of having been proved guilty." Black's Law Dictionary 408 (10th ed. 2014). In contrast our appellate court has described an NGRI adjudication as follows:

> "Simply put, under our system of law, an NGRI verdict is, in all form and substance, an acquittal. *** Ultimately, then, a successful insanity defense and a guilty verdict are mutually exclusive: a defendant found to be insane at the time of the crime's commission cannot be 'guilty' because, pursuant to his mental condition, he cannot make an effective choice regarding his behavior. [Citations.] Therefore, without culpable responsibility, guilt cannot attach and the result is an acquittal." *People v. Harrison*, 366 Ill. App. 3d 210, 214 (2006).

¶ 35    If the intention of the legislature was to have an NGRI finding act to conclusively bar an individual from receiving from the decedent, it has not stated so. Instead, the Slayer Statute expressly provides for a conclusive presumption of having intentionally and unjustifiably

caused death in only two instances—where a person is (1) *convicted of first degree murder* or (2) *convicted of second degree murder*. The scope of this presumption is free from doubt, and thus this court's only legitimate function is to declare and enforce the statute as enacted. *Berwyn*, 34 Ill. 2d at 323.

¶ 36                                    Collateral Estoppel

¶ 37    Having concluded that an NGRI judgment is not a presumptive bar to receiving from a decedent under the Slayer Statute, we now address the narrow question of whether the criminal court's finding respondent NGRI of first degree murder acts to collaterally estop him from receiving from Decedent under the Slayer Statute. Given the criminal trial judge's findings in respondent's case, we do not find the doctrine of collateral estoppel applicable here.

¶ 38    Collateral estoppel is an equitable doctrine whose purpose is to promote fairness and judicial economy by barring relitigation of issues already resolved in earlier actions. *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 77 (2001). The doctrine applies to civil and criminal cases. *People v. Scott*, 148 Ill. 2d 479, 555 (1992). The minimal threshold requirements for application of collateral estoppel are as follows: (1) the issue decided in the prior adjudication is identical to the one presented in the current action, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom the estoppel is asserted was a party to the prior adjudication or in privity with such a party. *Talarico v. Dunlap*, 281 Ill. App. 3d 662, 665 (1996). For collateral estoppel to apply, the factual issue against which the doctrine is interposed must have actually and necessarily been litigated and determined in the prior action. *Id.* Even when this threshold has been met, collateral estoppel will not be applied where injustice would result. *Id.*

¶ 39    The party asserting estoppel bears the heavy burden of showing with certainty that the identical and precise issue sought to be precluded in the later adjudication was decided in the previous adjudication. *Benton v. Smith*, 157 Ill. App. 3d 847, 853-54 (1987). Application of collateral estoppel must be narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment. *Kessinger v. Grefco, Inc.*, 173 Ill. 2d 447, 467 (1996). The doctrine will not apply if it is not clear that the former judgment or verdict necessarily decided the factual question at issue in the subsequent proceeding. *Scott*, 148 Ill. 2d at 555. Where uncertainty exists because more than one distinct factual issue was presented in the prior case, estoppel will not be applied. *Progressive Land Developers, Inc. v. Exchange National Bank of Chicago*, 266 Ill. App. 3d 934, 944 (1994). Collateral estoppel cannot be applied based on pure speculation as to what the trial court found in the prior case. *Anderson v. Financial Matters, Inc.*, 285 Ill. App. 3d 123, 131-32 (1996).

¶ 40    Furthermore, following the United States Supreme Court, our supreme court has stated that courts must be more cautious in allowing collateral estoppel to be used offensively to foreclose a defendant from litigating an issue the defendant had previously litigated unsuccessfully in another action. *In re Owens*, 125 Ill. 2d. 390, 397-99 (1988). Nonmutual offensive collateral estoppel refers to situations where a plaintiff who was not a party to the prior proceeding seeks to prevent a defendant from relitigating an issue previously decided. *Herzog v. Lexington Township*, 167 Ill. 2d 288, 295 (1995). In cases, such as the case at bar, where offensive nonmutual collateral estoppel is sought, our supreme court has said use of this doctrine brings into question considerations of fairness and thus circuit courts must have broad discretion to ensure that application of offensive collateral estoppel is not fundamentally unfair to the

defendant, even though the threshold requirements for collateral estoppel are otherwise satisfied. *Id.* at 295-96.

¶ 41                                    Identical Issues

¶ 42    We begin our analysis by examining whether the minimal threshold requirements for application of collateral estoppel have been met. As set forth above, the first requirement is that the issue decided in the prior adjudication is identical to the one presented in the current action. *Talarico*, 281 Ill. App. 3d at 665.

¶ 43    The issue to be decided in the current action is whether respondent acted "intentionally and unjustifiably" in causing Decedent's death under the Slayer Statute, which states in relevant part as follows:

> "A person who *intentionally and unjustifiably causes the death of another* shall not receive any property, benefit, or other interest ***." (Emphasis added.) 755 ILCS 5/2-6 (West 2012).

¶ 44    In order for the issue decided in the prior adjudication to be identical to the one presented in the current action, the criminal court would have to have actually and necessarily determined that (1) respondent intentionally caused Decedent's death and (2) that respondent unjustifiably caused Decedent's death. See *id.*

¶ 45    The probate court noted that, in order to have found respondent NGRI, the criminal court was required to first find that the State had proven beyond a reasonable doubt each element of the two charged first degree murder offenses. See 720 ILCS 5/6-2(e) (West 2012). The probate court stated that, by finding respondent NGRI on all counts, the criminal court necessarily found that the State met its burden to prove beyond a reasonable doubt all elements included in the charged offenses of first degree murder. From there, the probate court concluded that "the issues of intent and lawful justification were litigated during the criminal trial and a determination of [respondent's] mental state was necessary to the court's verdict."

¶ 46    Respondent was found NGRI of first degree murder under sections 9-1(a)(1) and 9-1(a)(2) of the Criminal Code (*id.* § 9-1(a)(1), (2)). Sections 9-1(a)(1) and 9-1(a)(2) of the Criminal Code provide as follows:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> (1) he either intends to kill *or do great bodily harm to that individual* or another, or knows that such acts will cause death to that individual or another; or
>
> (2) he knows that such acts create a strong probability of death *or great bodily harm to that individual or another ***." (Emphases added.) *Id.*

¶ 47    The criminal court did not specify whether it found respondent (1) intended to kill Decedent or (2) intended to cause Decedent great bodily harm or (3) knew that his acts would cause death to Decedent under section 9-1(a)(1), nor did it specify whether under section 9-1(a)(2) it found respondent (1) knew that such acts created a strong probability of Decedent's death or (2) knew that such acts created a strong probability of great bodily harm to Decedent. This is significant in this case because the criminal court could have found respondent NGRI if it only found that respondent *intended to cause Decedent great bodily harm* (9-1(a)(1)) *and knew that such acts created a strong probability of great bodily harm to Decedent* (9-1(a)(2)). Therefore we cannot say the criminal court's NGRI determination actually and necessarily

adjudicated the question of whether respondent *intended to cause Decedent's death* under the Slayer Statute.

¶ 48    The different actions that constitute first degree murder are distinguished within the statute by the use of the word "or." See *id.* Use of the disjunctive "or" marks an alternative indicating the various parts of the sentence that it connects are to be taken separately. *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 145 (2006). Accordingly, to find respondent NGRI of first degree murder under section 9-1(a)(1), the criminal court needed to find that the State had proven beyond a reasonable doubt that respondent performed the acts that caused Decedent's death without lawful justification and that when he did so any one of the following was also true: (1) he intended to kill Decedent or (2) he intended to do great bodily harm to Decedent or (3) he knew that such acts created a strong probability of death to Decedent.

¶ 49    Similarly, to find respondent guilty under first degree murder section 9-1(a)(2) the criminal court needed to find that the State had proven beyond a reasonable doubt that respondent performed the acts that caused Decedent's death without lawful justification and that when he did so any one of the following was also true: (1) he knew that such acts created a strong probability of death to Decedent or (2) he knew that such acts created a strong probability of great bodily harm to Decedent.

¶ 50    Therefore when the criminal court found respondent NGRI without specifically finding that he intentionally killed Decedent it did not actually and necessarily determine that respondent intentionally caused Decedent's death because an NGRI finding could have resulted where only great bodily harm was intended or was the known result of respondent's actions.

¶ 51    This reading of first degree murder is highlighted in *People v. Harris*, 72 Ill. 2d 16 (1978), which analyzed the elements of murder in the context of attempted murder. In *Harris* our supreme court recognized that " '[s]ome crimes, such as murder, are defined in terms of acts causing a particular result plus some mental state which need not be an intent to bring about that result.' " *Id.* at 27-28 (quoting Wayne R. LaFave & Austin W. Scott, Handbook on Criminal Law § 59, at 428 (1972)). The *Harris* court states that "[t]he crime of murder is thus committed not only when a person intends to kill another individual, but also when he intends to do great bodily harm *** , or when he knows that his acts create a strong probability of death or great bodily harm." *Id.* at 23. Accordingly, in the context of attempted murder, where defendant must act with an intent to kill, it is not sufficient to show that the accused intended to cause serious bodily harm in order to prove attempted murder. *Id.* at 27; see also *People v. Trinkle*, 68 Ill. 2d 198 (1977) (finding the inclusion of "bodily harm" language in a jury instruction improper because it would allow a jury to return an attempted murder guilty verdict on evidence that defendant intended only to cause great bodily harm short of death where an intent to kill is required for an attempted murder conviction).

¶ 52    More recently in *People v. Hopp*, 209 Ill. 2d 1 (2004), our supreme court reviewed the elements of murder, but this time in the context of conspiracy to commit murder. Referencing its decisions in *Harris* and *Trinkle*, the court reiterated that a person cannot be guilty of attempted murder unless he intended to kill and thus a jury instruction with the lesser intent to do great bodily harm under first degree murder (720 ILCS 5/9-1(a)(1) (West 2000)) is improper. *Hopp*, 209 Ill. 2d at 13. Similarly, in cases of conspiracy to commit murder the defendant must have intended a killing and, as such, a jury instruction for first degree murder

when combined with the instructions on conspiracy must make clear the State's burden to prove defendant intended to kill rather than to do great bodily harm. *Id.* at 13-14.

¶ 53 Here, as in the context of attempted murder and conspiracy to commit murder, intending to cause bodily harm is something very different than intending to kill someone or to cause death. See *Hopp*, 209 Ill. 2d 1; *Harris*, 72 Ill. 2d 16; *Trinkle*, 68 Ill. 2d 198.

¶ 54 The probate court relied on our supreme court's decision in *American Family Mutual Insurance Co. v. Savickas*, 193 Ill. 2d 378 (2000), to support its conclusion that intent and justification were necessarily adjudicated in respondent's criminal trial. We disagree with the probate court's application of *Savickas* to this case.

¶ 55 *Savickas* was convicted of first degree murder and was sued by the victim's estate for wrongful death and survival. *Id.* at 380. Savickas tendered the defense of the suit to his insurance provider. *Id.* However, the insurance policy contract had an exclusion that stated that the policy did not apply to "bodily injury 'expected or intended by any insured.' " *Id.* The insurance company sought summary judgment stating that Savickas was collaterally estopped by his first degree murder conviction, which necessarily adjudicated the fact that Savickas expected or intended the bodily harm to the victim, absolving the insurance company of obligation under the policy. *Id.* at 381. The *Savickas* court first determined that collateral estoppel may be accorded to a prior criminal conviction where the threshold requirements of collateral estoppel are met. *Id.* at 388. The court went on to determine that Savickas's first degree murder criminal conviction estopped Savickas from arguing that his conduct in causing bodily injury was not expected or intentional. *Id.* at 388-89. Specifically, the court stated that by finding Savickas guilty of first degree murder pursuant to sections 9-1(a)(1) and 9-1(a)(2) of the Criminal Code, he was found either to have "intended to kill the victim, or at least to have known that his acts created a strong probability of death or great bodily harm" and that this finding "establishe[d] that he intended or expected the results of his actions, the issue in the declaratory judgment action." (Internal quotation marks omitted.) *Id.*

¶ 56 The *Savickas* case can be distinguished. In *Savickas*, the issue in the insurers' declaratory judgment action was whether *the bodily injury was expected or intended* by Savickas because the insured's conduct causing expected or intended harm was excluded from coverage in the insurance contract. *Id.* Our question is a different one—whether respondent intentionally and unjustifiably caused the death of Decedent—which requires a different analysis. As explained above, the criminal court in this case did not adjudicate the question of whether respondent intentionally and unjustifiably caused decedent's death with its judgment finding defendant NGRI on both counts of first degree murder because the court could have made this finding believing respondent *intended to cause Decedent great bodily harm and knew that such acts created a strong probability of great bodily harm to Decedent*. Therefore the criminal court did not actually or necessarily find the respondent intended to cause the decedent's death.

¶ 57 Therefore we find the minimum threshold requirements for application of the doctrine of collateral estoppel have not been met and, thus, the doctrine is inapplicable to the facts of this case. See *Talarico*, 281 Ill. App. 3d at 665.

¶ 58                                Summary Judgment as a Matter Of Law

¶ 59 Petitioner argues that, even if collateral estoppel does not apply, this court should nevertheless find that the Slayer Statute bars respondent from receiving from Decedent as a matter of law.

- 11 -

¶ 60    The purpose of summary judgment is to determine whether any genuine issues of material fact exist, not to decide factual issues. *Commonwealth Eastern Mortgage Co. v. Williams*, 163 Ill. App. 3d 103, 108 (1987). A motion for summary judgment is only properly granted if the pleadings, depositions, admissions on file, affidavits, and exhibits, all being construed liberally in favor of the opponent, show that there is no issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

¶ 61    Petitioner relies on statements culled from three different sources: (1) respondent's response to petitioner's request to admit filed in this probate proceeding, (2) testimony from Dr. Christina Floreani stipulated to during respondent's criminal trial concerning statements made by respondent to Dr. Floreani, and (3) discovery deposition testimony of Dr. Roni Seltzberg during this probate proceeding concerning statements made by respondent to Dr. Seltzberg. The statements are as follows:

Respondent's response to petitioner's request to admit:

"Faskowitz stabbed Gayle multiple times with a sharp knife."

"Faskowitz killed Gayle at her residence."

Stipulated testimony of Dr. Christina Floreani at respondent's criminal trial:

"Faskowitz admitted to Dr. Christina Floreani that he 'took a knife with him to [Gayle's] apartment with the intent to kill her.' " (Emphasis omitted.)

"Faskowitz admitted to Dr. Floreani that 'I came into the [Decedent's] house. I had the keys. I thought she had changed the locks, but she didn't. She was just sitting there. I called her a monster, \*\*\* and I killed her.' "

Testimony from the discovery deposition of Dr. Roni Seltzberg in this probate proceeding:

"Faskowitz admitted to Dr. Roni Seltzberg that he brought the knife that he used to kill Gayle from his home to her home and let himself into Gayle's home."

"Faskowitz admitted to Dr. Seltzberg that he stabbed Gayle repeatedly and cut her neck to make sure she was dead."

"Faskowitz admitted to Dr. Seltzberg that prior to killing Gayle, Faskowitz came to believe that Gayle was 'evil' and that she was a 'skinhead.' "

"Faskowitz admitted to Dr. Seltzberg that prior to the day that Faskowitz actually killed Gayle, he had thought about killing her."

"Faskowitz admitted to Dr. Seltzberg that he killed Gayle because he believed that 'he had received a sign from the Lord that it would be the right thing for to [*sic*] him to kill [Gayle].' "

"Faskowitz admitted to Dr. Seltzberg that he killed Gayle because he believed that God wanted him to kill Gayle because 'she was making my life not worth living' and because 'she was teaching Skinheads to kill people born Orthodox Jews because they are like dogs and not humans so you can kill them if the opportunity arises.' "

"Faskowitz admitted to Dr. Seltzberg that he killed Gayle because he thought 'she was a leading Skinhead' and that she was 'trying to have me killed because I recognized a gay rabbi.' "

"Faskowitz admitted to Dr. Seltzberg that that [*sic*] he believed that when he heard the air conditioning go on during the killing of Gayle it 'meant that what he was doing was right, a message from God that this was good as he was basically saving the world.' "

¶ 62     Petitioner takes the position that these facts are judicial admissions, cannot be contradicted under the theory of judicial estoppel, and establish that respondent intentionally and unjustifiably caused Decedent's death thereby precluding him from receiving from Decedent under the Slayer Statute. Petitioner's argument rests on the theory that the aforementioned statements constitute judicial admissions by respondent.

¶ 63                                    Judicial Admissions

¶ 64     A judicial admission is a deliberate, clear, unequivocal statement by a party concerning a concrete fact within that party's knowledge. *North Shore Community Bank & Trust Co. v. Sheffield Wellington LLC*, 2014 IL App (1st) 123784, ¶ 102. The effect of a judicial admission is to withdraw a fact from issue, making it unnecessary for the opposing party to introduce evidence in support thereof. *Freedberg v. Ohio National Insurance Co.*, 2012 IL App (1st) 110938, ¶ 31. Judicial admissions include admissions made in pleadings, testimony in open court, stipulations, and in response to requests to admit. *Dremco, Inc. v. Hartz Construction Co.*, 261 Ill. App. 3d 531, 536 (1994). Once made, a judicial admission may not be contradicted in a motion for summary judgment. *Freedberg*, 2012 IL App (1st) 110938, ¶ 31. Courts will not apply the doctrine of judicial admissions to bar claims or defenses where there was other evidence to support such a claim or defense. *Hurley v. Phillips*, 54 Ill. App. 2d 386, 388-90 (1964).

¶ 65     In order for testimony to be binding, it must be peculiarly within the knowledge of the deponent. *Hansen v. Ruby Construction Co.*, 155 Ill. App. 3d 475, 482 (1987). Accordingly, the witness must be in a position to know the fact about which he is testifying. *Eidson v. Audrey's CTL, Inc.*, 251 Ill. App. 3d 193, 196 (1993). Judicial admissions only apply when a party's testimony, taken as a whole, is unequivocal. *Dunning v. Dynegy Midwest Generation Inc.*, 2015 IL App (5th) 140168, ¶ 50. When analyzing whether testimony is equivocal, the court must consider the whole testimony, as the determination depends on an evaluation of all the testimony not just a part of it. *Id.*; *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 788 (2002).

¶ 66              Testimony of Dr. Roni Seltzberg and Dr. Christina Floreani

¶ 67     Petitioner argues that Dr. Seltzberg's deposition testimony in this probate proceeding and Dr. Floreani's stipulated trial testimony in the criminal proceeding concerning statements made to each of them by respondent should constitute a judicial admission as to respondent's statements. We do not agree that such testimony is subject to the judicial admission rule for the reasons set forth below.

¶ 68     Dr. Seltzberg's discovery deposition testimony in this matter cannot constitute a judicial admission as to statements respondent made to Dr. Seltzberg. Illinois Supreme Court Rule 212 (eff. Jan. 1, 2011) governs the purposes for which a discovery deposition may be used. Rule 212 provides that an admission made by a party at a pretrial deposition that is deliberate, detailed, and unequivocal as to matters within the party's knowledge will conclusively bind the party-deponent and he will not be heard to contradict the admission. *Commonwealth*

*Eastern Mortgage Co.*, 163 Ill. App. 3d at 108-09. The judicial policy behind this rule is that, once a party has given sworn testimony, he should not be allowed to commit perjury and change his testimony to avoid the consequences of the prior testimony. *Id.* at 109.

¶ 69     However, the deposition statements offered by petitioner here are not respondent's under oath deposition statements, but those of Dr. Seltzberg concerning statements made to her by respondent. Different evidentiary rules apply to the use of deposition testimony of a party versus a nonparty. *In re Estate of Rennick*, 181 Ill. 2d 395, 408 (1998). The deposition of a party may contain admissions that are an exception to the rule excluding hearsay, while the deposition of a nonparty witness is hearsay generally admissible only for impeachment purposes. *Id.* Respondent's statements to Dr. Seltzberg may not constitute hearsay pursuant to Illinois Rule of Evidence 801(d)(2) (eff. Oct. 15, 2015) as an admission by a party opponent; however, Dr. Seltzberg's testimony concerning what respondent said to her does not turn respondent's statements into judicial admissions. Instead, such an admission is an evidentiary admission subject to explanation and contradiction by other evidence. See *Elliott v. Industrial Comm'n*, 303 Ill. App. 3d 185, 187 (1999).

¶ 70     With respect to Dr. Floreani's stipulated statements in the criminal trial, it must be noted that the stipulation was only as to what Dr. Floreani would testify to if she were called as a witness in the criminal trial. " '[A] stipulation as to the testimony *** a witness would give if called, although it may constitute evidence of the facts covered, is not an admission of the truth of such testimony and does not prevent a party from attacking it as he might attack the testimony itself, had it been given.' " *People v. Harris*, 2015 IL App (4th) 140696, ¶ 36 (quoting *United States v. Spann*, 515 F.2d 579, 583 (10th Cir. 1975)).

¶ 71     Dr. Seltzberg and Dr. Floreani are not parties to this litigation. Even if the doctors were considered experts in this probate proceeding, such witness testimony is not subject to the judicial admission rule where the testimony is not sufficiently clear, deliberate, and unequivocal. *Mitsias v. I-Flow Corp.*, 2011 IL App (1st) 101126, ¶ 55. Looking at each doctor's testimony in its entirety, there are a number of statements that suggest respondent's statements to the doctors, which petitioner seeks to classify as judicial admissions, were something other than clear, deliberate, and unequivocal. Dr. Floreani's stipulated testimony included the statement that at the time of Decedent's death respondent was legally insane experiencing acute psychosis, etiologically based in the mental disease of schizophrenia. Respondent's condition may have impacted respondent's ability to accurately report the events surrounding Decedent's death. Moreover, as part of her stipulated testimony, Dr. Floreani would testify that respondent stated to her "[a]t that point, I was already thinking that there were these people running around like demons, posing as people, and I thought Gayle might be one of these demons" creating uncertainty as to who or what respondent believed he was interacting with. As to Dr. Seltzberg's testimony, on the two occasions respondent met with the doctor and described the events surrounding Decedent's death, Dr. Seltzberg testified she believed respondent to be fairly coherent but still delusional at their first meeting and respondent had paranoid delusions and other psychotic interpretations of things that were happening around him at the second meeting. Respondent reported to Dr. Seltzberg that he believed his killing Decedent was self-defense. Respondent also reported that he believed Decedent was trying to kill him or have him killed. Dr. Seltzberg testified that she did not think respondent thought of Decedent as a person because he referred to people as being demons. Moreover, respondent's statements sought to be introduced as judicial admissions were not

- 14 -

peculiarly within either doctor's knowledge. See *Hansen*, 155 Ill. App. 3d at 482. Neither Dr. Floreani nor Dr. Seltzberg was present when Decedent was killed. Even if they had been present, they could not know what was in respondent's mind at the time.

¶ 72                    Respondent's Responses to Request to Admit

¶ 73        Having determined that statements made by respondent to Drs. Seltzberg and Floreani are not judicial admissions, we address respondent's responses to petitioner's request to admit, which do constitute judicial admissions. *Richard v. Nederlander Palace Acquisition, LLC*, 2015 IL App (1st) 143492, ¶ 34. The two judicial admissions are as follows:

> "[Gayle's] death resulted from Faskowitz stabbing her multiple times with a sharp knife."

> "The stabbing and death occurred at Ivy's residence ***."

¶ 74        These two statements, while judicial admissions, do not establish as a matter of law that respondent intentionally and unjustifiably caused Decedent's death. They say nothing about respondent's intentions or whether any justification exists for respondent's conduct. Thus, these admissions alone are insufficient to bar respondent from receiving as a matter of law under the Slayer Statute.

¶ 75                              Judicial Estoppel

¶ 76        Petitioner argues that judicial estoppel should be applied to respondent's admissions. Judicial estoppel is an equitable doctrine intended to protect the integrity of the judicial process by prohibiting parties from deliberately taking a contrary position to one the litigant took and benefited from in an earlier proceeding. *Seymour*, 2015 IL 118432, ¶ 36. This doctrine is an extraordinary one that should be applied with caution. *Id.* ¶ 39 (citing *Construction Systems, Inc. v. FagelHaber, LLC*, 2015 IL App (1st) 141700, ¶ 38). There are five prerequisites generally required to invoke judicial estoppel, as follows: the party to be estopped must have (1) taken two positions (2) that are factually inconsistent (3) in separate judicial or quasi-judicial administrative proceedings, (4) intended for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it. *Id.* ¶ 37. The doctrine of judicial estoppel is invoked by the court at its discretion. *Id.* ¶ 41.

¶ 77        As set forth above, aside from respondent's responses to petitioner's request to admit, none of the statements presented by petitioner constitute judicial admissions. We also note that some of the statements relied on by petitioner in his judicial estoppel argument were not made in a separate judicial proceeding as required for judicial estoppel to apply. *Id.* ¶ 37. Specifically, respondent's responses to petitioner's request to admit and Dr. Seltzberg's deposition testimony both were made during this probate matter. Therefore judicial estoppel cannot apply. As to the stipulated criminal trial testimony of Dr. Floreani, as discussed *supra*, the statements made by respondent to the doctor were in and of themselves contradictory as to whether respondent intentionally and unjustifiably caused Decedent's death, and therefore judicial estoppel cannot be appropriately applied even if the statements were judicial admissions. Moreover, a stipulation as to expert testimony merely dispenses with evidentiary proof of their testimony to include qualifications, examinations, and diagnosis and do not amount to a factual admission. *People v. Pettit*, 97 Ill. App. 3d 692, 697 (1981); *Harris*, 2015 IL App (4th) 140696, ¶ 36.

¶ 78    Judicial estoppel is inapplicable even if we look generally at respondent's having successfully raised an insanity defense in the criminal trial. A verdict of NGRI establishes two facts: (1) that defendant committed the act that constitutes the criminal offense, in this case first degree murder, and (2) that he committed the act because of mental illness. *People v. Wells*, 294 Ill. App. 3d 405, 407 (1998) (citing *Jones v. United States*, 463 U.S. 354, 363 (1983)), *not followed as dicta on other grounds by People v. Harrison*, 226 Ill. 2d 427, 434 (2007). As explained in the context of collateral estoppel, a general finding that respondent committed the act that constitutes first degree murder but is nonetheless NGRI does not equate to an adjudication as to respondent's intent under the Slayer Statute. Accordingly, as with collateral estoppel, respondent's insanity defense in his criminal trial is not a factually inconsistent position to respondent's claim here that he did not intentionally and unjustifiably cause Decedent's death.

¶ 79    Finally, petitioner argues that he is entitled to summary judgment as a matter of law because respondent failed to introduce competent evidence to dispute the facts establishing that he intended to cause Decedent's death. We disagree.

¶ 80    Summary judgment is a drastic measure and should only be granted where the movant's right to judgment is clear and free from doubt. *McGinley Partners, LLC v. Royalty Properties, LLC*, 2018 IL App (1st) 171317, ¶ 33. The party moving for summary judgment bears the initial burden of proof by either (1) affirmatively showing that some element of the case must be resolved in his favor or (2) establishing that there is an absence of evidence to support the nonmoving party's case. *Id.* Where plaintiff is the moving party, he must establish through the pleadings and supporting documents the validity of his factual position on all of the contested elements of the cause of action. *Performance Food Group Co. v. ARBA Care Center of Bloomington, LLC*, 2017 IL App (3d) 160348, ¶ 18. Once the moving party satisfies its initial burden of production, the burden of production shifts to the nonmoving party to present evidence to establish that there are genuine issues of material fact and/or that the moving party is not entitled to summary judgment as a matter of law. *Id.* We construe the record strictly against the movant and liberally in favor of the nonmoving party. *Seymour*, 2015 IL 118432, ¶ 42.

¶ 81    Petitioner moved for summary judgment and bears the initial burden of establishing through pleadings and supporting documents all of the essential elements of his claim that were not admitted by respondent. *Performance Food Group Co.*, 2017 IL App (3d) 160348, ¶ 18. Here petitioner must establish that respondent "intentionally and unjustifiably" caused Decedent's death. Upon review of the pleadings and all supporting documents presented by petitioner, there remains a factual dispute as to whether respondent intentionally caused Decedent's death.

¶ 82    Petitioner argues that under the intent standard in *Dougherty v. Cole*, 401 Ill. App. 3d 341, 348 (2010), respondent intentionally and unjustifiably caused Decedent's death because he was cognizant that he was killing Decedent. *Dougherty*, cited by petitioner, is factually dissimilar to the instant case. In *Dougherty* the probate court specifically noted that the decedent's murder was unjustifiable, and neither party argued otherwise. *Id.* at 346. Further the defendant testified he knew the person he beat and stabbed was the decedent and he knew he was trying to kill the decedent when he grabbed the knife and stabbed her. *Id.* at 346-47. Similarly, in *Laborers' Pension Fund v. Miscevic*, 880 F.3d 927, 936 (7th Cir. 2018), there was a finding by the criminal court that the defendant intended to murder the decedent without

justification. No such findings or testimony exist from respondent's criminal trial, and there was no testimony during the probate proceedings.

¶ 83 Moreover, we note that even petitioner's contention that respondent was cognizant that he was killing Decedent is contradicted by petitioner's own supporting documents, which internally create an issue of fact. For example, Dr. Seltzberg's deposition indicates it was not clear that respondent was even capable of accurately reporting on the events that transpired at the time of Decedent's death because at the time of this reporting respondent was still delusional or had other psychotic interpretations of things that were happening around him. Nevertheless, when asked if respondent understood he was killing Decedent, both Drs. Seltzberg and Floreani reference the fact that respondent may have believed Decedent was not Decedent, but a demon. Dr. Seltzberg also referenced respondent's belief that he was acting in self-defense.

¶ 84 Petitioner, in further support of his argument for summary judgment as a matter of law, cites *People v. Medrano*, 271 Ill. App. 3d 97, 103-04 (1995), which provides that "[t]here is a presumption of an intent to kill where one voluntarily commits an act, the natural tendency of which is to destroy another's life." The theory behind this presumption is that "since every sane man is presumed to intend all the natural and probable consequences flowing from his own deliberate acts it follows that if one wilfully does an act the direct and natural tendency of which is to destroy another's life, the natural and irresistible conclusion, *in the absence of qualifying facts*, is that the destruction of such other person's life was intended." (Emphasis added.) *People v. Coolidge*, 26 Ill. 2d 533, 537 (1963). While the law presumes that all persons are sane, this presumption serves no useful purpose when the issue of the defendant's insanity is clearly raised and even more so in the instant case where respondent's insanity has been adjudicated by the criminal court. *People v. Dwight*, 368 Ill. App. 3d 873, 879 (2006).

¶ 85 Under the facts before us, the question of whether respondent "intentionally" caused Decedent's death for purposes of the Slayer Statute remains a question of material fact that cannot be resolved as a matter of law. Accordingly summary judgment is not appropriate.

¶ 86                                    CONCLUSION

¶ 87 For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and this case is remanded for further proceedings consistent with this opinion.

¶ 88 Reversed and remanded.