2026 IL App (1st) 240052-U
No. 1-24-0052

SIXTH DIVISION
March 31, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| ANNIE LAM, Independent Administrator of the Estate of Tuong Lam, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 2019 L 003062 |
| CITY OF CHICAGO, a municipal corporation, | ) ) | |
| Defendant-Appellant. | ) ) ) ) | The Honorable Bridget J. Hughes, Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's entry of judgment for the plaintiff.  The trial court correctly found that section 2-1117 of the Code of Civil Procedure did not apply to permit the jury to apportion fault between the City and the driver who struck and killed plaintiff's decedent. The trial court also did not err in deciding the City's contribution claim despite the City's jury demand. The court erred in finding that equivocal deposition testimony was a judicial admission, but such error was harmless.

¶ 2    In this wrongful death action, defendant City of Chicago appeals after the circuit court entered judgment on the jury verdict in favor of plaintiff. For the following reasons, we affirm.

¶ 3                                   BACKGROUND

¶ 4    In April 2018, an unmarked City of Chicago police vehicle engaged in a pursuit of a car driven by Jusef Wofford. During the chase, Wofford's vehicle struck and killed Mr. Tuong Lam, an innocent bystander. Wofford subsequently pleaded guilty to aggravated driving under the influence (DUI). The record reflects that Wofford was incarcerated during the underlying proceedings.

¶ 5    At the time of the pursuit, the Chicago Police Department had issued General Order G03-03-01, (the General Order), which states that it "establishes procedures, responsibilities, and restrictions for all sworn Department personnel who become involved in motor vehicle pursuits."[1] Section 2 states that the initiation and continuation of a motor vehicle pursuit "must conform to the following **BALANCING TEST: The necessity to immediately apprehend the fleeing suspect outweighs the level of inherent danger created by a motor vehicle pursuit."** (Emphasis in original).

¶ 6    Section III of the General Order contained various "PROHIBITIONS." As of 2018, Section III.A. stated: "Members will not engage in a motor vehicle pursuit whenever the most serious offense for which the motor vehicle is wanted is a non-hazardous traffic offense." Section III. B. specified that: "Members will not engage in a motor vehicle pursuit while: *** operating unmarked vehicles, if the most serious offense is a traffic offense."[2] Elsewhere in the General Order, the term "traffic offense" was defined to mean "a violation as defined in the Illinois Vehicle Code or Title 9 of the Chicago Municipal Code." Driving under the influence of alcohol is prohibited by the Illinois Vehicle Code. 625 ILCS 5/11-501 (West 2018).

---

[1] In this case, the operative version of the General Order was that issued on March 28, 2016, which was in effect at the time of the police pursuit of Wofford. All quotations are from that version.

[2] The General Order has since been modified and currently states that police will not engage in a pursuit whenever the most serious offense wanted for is "a traffic offense, other than driving under the influence of alcohol and/or drugs." Chicago Police Department General Order G03-03-01 (Effective August 15, 2020).

¶ 7    In another section entitled "RESPONSIBILITIES AND PROCEDURES WHEN A PURSUIT IS INITIATED," the general order provided that the officer initiating the pursuit will "immediately notify the OEMC [Office of Emergency Management and Communications] dispatcher that a pursuit is in progress" and "ensure verbal approval from the assigned supervisor has been granted to continue with the pursuit."

¶ 8    Mr. Lam's daughter, Annie Lam (plaintiff) filed a wrongful death complaint against the City and Wofford. Plaintiff alleged that the police pursuit constituted willful and wanton conduct, such that the City could be held liable notwithstanding the Local Governmental and Governmental Employees Tort Immunity Act. See 745 ILCS 10/2-109 (West 2022) ("A local public entity is not liable for injury resulting from an act or omission of its employee where the employee is not liable"); 745 ILCS 10/2-202 (West 2022) ("A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct.").

¶ 9    The City answered and asserted affirmative defenses. At the same time, the City also filed a "Counterclaim for Contribution" against Wofford pursuant to the Joint Tortfeasor Contribution Act, 740 ILCS 100/1 *et seq.* (Contribution Act). The City alleged that any finding of liability to plaintiff was due to Wofford's conduct, such that Wofford would be obligated to pay his pro rata share of a judgment in plaintiff's favor. The City filed a jury demand on the same date that it filed its answer and counterclaim.

¶ 10    In July 2023, plaintiff moved to voluntarily dismiss her claim against Wofford and filed an amended complaint that named the City as the only defendant. The trial court granted the motion to dismiss Wofford, but in the same order it specified that the City's counterclaim against Wofford was "to stand."

¶ 11    Wofford did not answer the counterclaim, and the City moved for default judgment against him. On July 31, 2023, an order of default was entered against Wofford.

¶ 12    Wofford was deposed on August 10, 2023. Wofford denied that he was intoxicated at the time of the pursuit, although he had "a beer" hours earlier. He acknowledged that he pleaded guilty to aggravated DUI, but said he did so because he "felt sorry for [Lam's] family" and did not "have a real lawyer." He stated that when the police were chasing him, he thought "they wanted me to hit somebody so I would die." He conceded that he did not have permission to drive the car and that "the car was stolen," but he invoked the Fifth Amendment when asked if he knew if the vehicle was stolen at the time of the pursuit. At another point, he stated that the "plates were switched" on the vehicle. He otherwise indicated he was afraid because "a lot of people w[ere] getting killed by the cops, and I didn't want to pull over."

¶ 13    In August 2023, plaintiff filed a motion to sever the City's counterclaim for contribution against Wofford. Plaintiff urged that plaintiff and the City were the only true parties to the action, and the "counterclaim should be tried separately to avoid prejudice" to plaintiff's claim against the City and to prevent "juror confusion."

¶ 14    The trial court (Hon. Brendan O'Brien) held a hearing on the motion to sever. During the hearing, plaintiff argued that severance of the counterclaim was proper because the only issue was whether the City's "willful and wanton conduct" proximately caused Lam's death, and that the City's counterclaim against Wofford did not implicate joint and several liability pursuant to section 2-1117 of the Code of Civil Procedure. See 735 ILCS 5/2-1117 (West 2022). Plaintiff argued that because section 2-1117 specifically applies to actions "based on negligence," it did not apply to a case involving allegations of willful and wanton conduct.

¶ 15    The court recognized that the standard to hold the City liable is "willful and wanton" and expressed concern that the jury would have difficulty in "apportion[ing] fault with two different standards." The court remarked that willful and wanton "is, essentially, negligence. But it could be intentional *** the City has to be more than just at fault. They have to rise to the level of *** reckless indifference toward the rights of others, which that standard doesn't apply to Wofford. So how does a jury do that?"

¶ 16    City counsel responded that to follow plaintiff's reasoning would be "punishing the city" and essentially removing application of section 2-1117 from actions against the City because the City has immunity from ordinary negligence.

¶ 17    The trial court remarked that it could order consecutive trials with the same jury as to (1) liability against City and, if the jury found the City liable, (2) contribution claim against Wofford. It acknowledged the City wanted Wofford to be on the verdict form, but remarked: "If the jury is going to assess fault with two different standards, to me that could lead to confusion." The court determined that Wofford would not appear on the general verdict form on plaintiff's claim against the City. However, it stated that, if the jury found the City liable, it would conduct a consecutive trial before the same jury as to the City's contribution claim against Wofford.

¶ 18                          Motions *in Limine*

¶ 19    Judge Bridget Hughes was subsequently assigned as the trial judge.

¶ 20    Before trial, the court granted plaintiff's motion *in limine* to bar evidence that Wofford was driving a stolen vehicle.

¶ 21    In another motion *in limine*, plaintiff sought to deem as judicial admissions certain deposition testimony by Chicago Police Captain Misael Ramirez, who had been designated by the City to testify regarding the City's policies for police pursuits. According to plaintiff,

Ramirez's deposition testimony included an admission that the pursuit of Wofford did not comply with section III of the General Order. In his deposition, Ramirez indicated his view that it was permissible for an unmarked police car to pursue a driver suspected of being under the influence of alcohol, as he believed that DUI was more than a mere "traffic offense." However, when Ramirez was asked if "pursuing in an unmarked vehicle for DUI was prohibited"; he answered: "Based on No. 3, strictly speaking, yes."

¶ 22   In argument on the motion *in limine*, the City's counsel pointed out that, elsewhere in the deposition, Ramirez repeatedly indicated that he "believes DUI is a pursuable offense" because it was more than a simple "traffic offense." Nonetheless, the trial court agreed that Ramirez made a judicial admission when he answered that, "strictly speaking," pursuit by an unmarked police car for a suspected DUI was prohibited.

¶ 23                                      Trial

¶ 24   Just before trial began, the court reiterated its ruling that Ramirez' "strictly speaking" answer was a judicial admission.

¶ 25   In opening statement, plaintiff's counsel argued that the police officers' choice to pursue Wofford "violated CPD rules and policies." Counsel told the jury that it was undisputed that police in an unmarked car are prohibited from "starting a police pursuit *** for a traffic violation, a traffic offense," but the officers in this case had done so.

¶ 26   Following opening statements and before calling any witnesses, plaintiff's counsel referred to the judicial admission as follows:

> "The first thing I'm going to present to the jury is a judicial admission. A city of Chicago corporate representative has testified as follows: *** 'Based on the plain language of this order that was

in effect on this day, pursuing in an unmarked vehicle for DUI was

prohibited. ANSWER: Based on No. 3, strictly speaking, yes.'"

¶ 27    Plaintiff called Chicago Police Officer Enes Menkovic, who testified that he was driving the unmarked police vehicle involved in the pursuit of Wofford. Two other officers, Frank Iza and Elias Abudaye, were also in the car.

¶ 28    Menkovic testified that he suspected Wofford was driving under the influence of alcohol. He first observed Wofford when a van pulled up alongside the police vehicle at a red light. He noticed Wofford was slouched, "like leaning over" and then he looked over to the officers' car "to see if our attention was brought *** over to him." When the light turned green, Wofford initially "stayed behind" and proceeded very slowly, before he "sped up to pass" the police vehicle. Menkovic then observed Wofford engage in "improper lane usage." Menkovic explained that this gave him "reasonable suspicion" that "this guy might potentially be a DUI."

¶ 29    As the police car followed, the officers observed Wofford make a sudden turn going the wrong way down a one-way street. Wofford failed to "correct himself," and sped up. Menkovic testified that he activated the police car's lights and sirens to warn the public. He pursued Wofford for several blocks, reaching speeds of approximately 75 miles per hour. He felt he needed to pursue Wofford because "he was driving the wrong way on a one-way street endangering the public."

¶ 30    Menkovic was shown the General Order, which he acknowledged governed the rules for police pursuits. He agreed that the order prohibited unmarked police cars from a pursuit if the most serious offense is a traffic offense. Menkovic testified that when the pursuit started, Wofford had committed improper lane usage, went the wrong way on a one-way street, and that

he had a "potential DUI." Menkovic disagreed when plaintiff's counsel asked if he violated the General Order by pursuing for a suspected DUI.

¶ 31    Menkovic acknowledged that the General Order also required him to contact OEMC to inform them of the pursuit. He stated that he did not do so, as events "happened so fast" and he was focused on driving.

¶ 32    Menkovic identified surveillance footage from a local business showing the crash, which was played before the jury.

¶ 33    On cross-examination by the City, City's counsel asked Menkovic: "Did you pursue Mr. Wofford because you believed he was committing a traffic offense?" Menkovic answered: "I did not." At that point, plaintiff's counsel objected, and a sidebar ensued. The trial court agreed with plaintiff that, due to the ruling on the judicial admission, the City "can't ask that question." Thus, it sustained plaintiff's objection.

¶ 34    On re-direct examination by plaintiff's counsel, Menkovic agreed that he was prohibited from chasing if the most serious offense is a traffic offense. He agreed when asked if "the chase should never have started under the prohibitions in the General Order."

¶ 35    The jury also heard testimony from Officer Iza regarding the pursuit. Iza acknowledged that he did not contact OEMC by radio to inform them of the pursuit. He indicated he did not do so because he was operating a spotlight and talking on a horn during the chase. Iza acknowledged that Officer Abudayeh also had a radio but did not contact OEMC.

¶ 36    The jury watched portions of Wofford's deposition. Pursuant to the trial court's pretrial ruling, the jury did not hear Wofford's statement that the car was stolen.

¶ 37    Plaintiff also called an expert witness on police pursuit practices, Dr. Andrew Scott. He opined that the officers should not have engaged in the pursuit because CPD policy "prohibits

pursuit by unmarked vehicles for traffic violations" and that Menkovic otherwise violated CPD policy by failing to notify OEMC that he was engaged in the pursuit. Plaintiff elicited his agreement that "Captain Misael Ramirez testified unequivocally that these officers were prohibited from starting this chase per the general orders" and that "chasing for DUI in an unmarked car is against the rules."

¶ 38     The evening before the court instructed the jury, the court communicated the following to the parties (via email):

> "I will not put Mr. Wofford on the verdict form. I am even prepared to rule, as a matter of law, that 111-7 [sic] does not apply to this case. This means that it is unnecessary to ask the jury to apportion fault as any verdict in the plaintiff's favor will result in a judgment against the city without a possible set off for contribution. I would proceed to a prove-up against Wofford since there is a default judgment. However, I will give the [City] one more night to find any case that would hold otherwise. I will not change my ruling and allow Mr. Wofford on verdict form but I may consider asking the jury to determine apportionment, after they reach a verdict on liability, assuming it is in plaintiff's favor. If I allow this, it would only be to let the question of the application of 111-7 [sic] go to appellate court."

¶ 39     The next day, prior to closing argument, the court confirmed its ruling that section 2-1117 did not apply, meaning the verdict form would not ask the jury to apportion fault between the City and Wofford. The court commented that the "plain language" of the statute "clearly states

negligence, and it doesn't state willful and wanton." It reasoned "you cannot put negligent defendants and willful and wonton defendants on the same playing field when you're trying to determine apportionment of fault."

¶ 40    The court and parties also discussed how to handle the City's contribution claim against Wofford, assuming the jury returned a verdict for plaintiff against the City. Plaintiff took the position that, as the City already obtained a default against Wofford, there was "no longer a jury question" on the contribution claim and "It's a question for the Court to apportion the percentages." The City responded that, although the default meant there was no question of Wofford's liability, the jury should still be asked to apportion fault. The City asked that, if the jury returned a plaintiff's verdict, it should be able to make "a brief argument [to the jury] as to the apportionment of fault" between City and Wofford. The trial court agreed with plaintiff that it (not a jury) would assess the City's contribution claim.

¶ 41    In its closing argument, plaintiff's counsel reminded the jury that "We started the case with what's called a judicial admission. The judicial admission *** was pursuing in an unmarked car for DUI is a prohibition."

¶ 42    Before the jury returned its verdict, the trial court informed the parties that it found "as a matter of law, that a finding of willful and wanton conduct by a municipal actor bestows liability that's fully and severally held against the municipality" that "can't be diminished in any way by a co tort-feasor." Thus, it held that if the City was found liable for willful and wanton conduct, its liability to plaintiff could not be reduced by any fault of Wofford. Regarding the City's contribution claim against Wofford, the court told the City: "You got a default judgment, so I can do a prove-up." The City noted for the record its view that the jury should determine the proportion of fault for the contribution claim.

¶ 43    The jury returned a verdict in plaintiff's favor against the City in the total amount of $10.5 million.

¶ 44                                    Post-Trial Motion

¶ 45    On October 16, 2023, the City moved for a new trial on several grounds. Among these, the City urged the court erred in finding that statements by Ramirez were judicial admissions, including his answer that, "strictly speaking," pursuit by an unmarked vehicle for DUI was prohibited.

¶ 46    The City also urged that the court erred in concluding that, as a matter of law, section 2-1117 did not apply to allow for apportionment of fault. The City urged that the statute applied to "all claims of negligence," including willful and wanton conduct.

¶ 47    The City separately urged that the court erred in refusing to allow the jury to determine the City's counterclaim for contribution against Wofford. It noted that this contradicted the August 9, 2023 order by Judge O'Brien indicating that the counterclaim would be heard by the same jury that decided plaintiff's claim against the City.

¶ 48    On November 21, 2023, the court heard argument and denied the City's motion for new trial. In so doing, it declined City's request "for the jury to assess the percentage of fault attributed to the City and Mr. Wofford." The court determined that it would "assess the level of [Wofford's] responsibility in the case based upon the facts of the case."

¶ 49                 The Trial Court Decides the City's Contribution Claim

¶ 50    In December 2023, the court held a prove-up hearing. The court denied the City's request to call witnesses. After hearing argument, the court found that the City and Wofford were each "50 percent responsible."

¶ 51                                    ANALYSIS

¶ 52    On appeal, the City asserts there were separate errors entitling it to a new trial. The City primarily claims the court erred in concluding that section 2-1117 of the Code of Civil Procedure was inapplicable to plaintiff's claim against the City, which precluded the jury from determining apportionment of fault. That is, the City urges it had a right to attempt to prove to the jury that it was minimally responsible compared to Wofford. It contends that if the jury found it was less than 25% at fault, its liability would be limited to its share, rather than being subject to joint and several liability.[3]

¶ 53    As to its contribution counterclaim against Wofford, the City separately urges the court erred by holding a hearing where the court (not a jury) assessed the City and Wofford's respective levels of responsibility. The City contends the court could not "substitute[t] itself as the trier of fact" on this matter, where the City had a jury demand.

¶ 54    The City independently urges that it is entitled to reversal based on evidentiary rulings, including the trial court's ruling that Ramirez's deposition testimony constituted a judicial admission. For the following reasons, we find the City's claims of error without merit and affirm the trial court.

¶ 55    Section 2-1117 Did Not Apply to Plaintiff's Willful and Wanton Claim Against the City

¶ 56    We first address the City's contention that the court erred in determining that section 2-1117 could not apply because plaintiff's claims against the City were premised on willful and wanton conduct, rather than ordinary negligence. That is, the City urges that the jury deciding plaintiff's claim should have been permitted to apportion fault between the City and Wofford.

¶ 57    As to the standard of review, we recognize that the abuse of discretion standard applies to a court's decision relating to  jury instructions, including verdict forms. *Ramirez v. FCL*

---

[3] The City acknowledges that, if a jury were to apportion more than 25% fault to it, the City would be jointly and severally liable by operation of section 2-1117.

*Builders, Inc*., 2014 IL App (1st) 123663, ¶ 182 (analyzing whether verdict form asking to apportion fault should have included plaintiff's employer). The standard for whether a trial court abused its discretion with respect to jury instructions is whether, taken as a whole, they fairly and fully apprised the jury of the relevant legal principles. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp*., 201 Ill. 2d 260, 273 (2002). "If the court gives an instruction that inaccurately states the law, reversal is warranted if the error resulted in serious prejudice." *Barnai v. Wal-Mart Stores, Inc*., 2017 IL App (1st) 171940, (finding reversible error where verdict form precluded the jury from assigning fault to a settling defendant); see also *Schultz*, 201 Ill. 2d at 273 ("A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant.")

¶ 58     Here, the trial court's decision to omit Wofford from the jury verdict form stemmed from its interpretation of section 2-1117. Thus, its ruling implicates questions of statutory interpretation, which are reviewed *de novo*. See *People v. Burge*, 2021 IL 125642, ¶ 20. The "primary objective" in statutory interpretation "is to ascertain and give effect to the intent of the legislature" and the "best indication of that intent is the statute itself, giving it its plain and ordinary meaning." *Id*. "If the language of a statute is clear and unambiguous, we will give effect to the statute's plain meaning without resort to other aids of statutory construction." *Id*. "[C]ourts may not depart from a statute's plain language by reading into it exceptions, limitation, or conditions the legislature did not express." *Id*.

¶ 59     Section 2-1117 "modified the common law rule of joint and several liability" by which a plaintiff "could recover compensation for the full amount of his injury from any defendant responsible for the injury." *Unzicker v. Kraft Food Ingredients Corp*., 203 Ill. 2d 64, 70 (2002). Section 2-1117 of the Code of Civil Procedure provides:

"Except as provided in Section 2-118, in actions on account of bodily injury or death or physical damage to property, based on negligence *** all defendants found liable are jointly and severally liable for plaintiff's past and future medical and medically related expenses. Any defendant whose fault, as determined by the trier of fact, is less than 25% of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendant except the plaintiff's employer, shall be severally liable for all other damages. Any defendant whose fault, as determined by the trier of fact, is 25% or greater of the total fault attributable to the plaintiff, the defendants sued by the plaintiff, and any third party defendants except the plaintiff's employer, shall be jointly and severally liable for all other damages." 735 ILCS 5/2-1117 (West 2024).

¶ 60    Under this statute, "a defendant whose fault is 25% or greater is jointly and severally liable for these damages, while a defendant whose fault is less than 25% is only severally liable. In making this determination, the fault to be considered is that of 'the plaintiff, the defendants sued by the plaintiff and any third party defendant who could have been sued by the plaintiff." *Ready v. United/Goedecke Services, Inc.*, 232 Ill. 2d 369, 376 (2008).

¶ 61    Here, the City contends that the court erred when it determined that section 2-1117 cannot apply where defendants are accused of willful and wanton conduct. The City urges that such actions are still "based on negligence" and fall within the scope of the apportionment statute.

¶ 62    On the other hand, plaintiff argues that the "plain language" of section 2-1117 does not apply to actions based on willful and wanton conduct. Plaintiff independently argues that, pursuant to *Ready v. United/Goedecke Services, Inc.*, 232 Ill. 2d 369 (2008), section 2-1117 does not apply to Wofford because he was a "dismissed defendant" at the time of trial. At oral argument, plaintiff also urged that the legislative history discussed in *Ready* applies here and supports the conclusion that willful and wanton conduct does not fall within the scope of claims "based on negligence", as that phrase appears in section 2-1117.

¶ 63                Willful and Wanton Conduct Is Beyond Mere "Negligence"

¶ 64    The trial court found that section 2-1117 did not apply to claims against the City based on willful and wanton conduct, concluding that they were distinct from mere negligence claims. We agree.

¶ 65    Section 2-117 applies to "actions on account of bodily injury or death or physical damage to property, *based on negligence*." (Emphasis added). 735 ILCS 5/2-1117 (West 2024). "The best evidence of the legislature's intent is the language of the statute, which must be given its plain and ordinary meaning." *Ready*, 232 Ill. 2d at 375.

¶ 66    Section 2-1117 does not define the phrase "based on negligence." However, the plain and ordinary meaning of "based on negligence" denotes conduct significantly below the level of culpability required for a finding of willful and wanton conduct. In other words, willful and wanton conduct requires significantly worse conduct than "negligence." Thus, willful and wanton conduct is not encompassed by section 2-1117.

¶ 67    Although section 2-1117 does not define "based on negligence," the legislature has defined the phrase "willful and wanton conduct." Section 1-210 of the Local Governmental and Governmental Employees Tort Immunity Act defines "willful and wanton conduct" to mean "a

course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or serious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2024). Finding this section "clear and unambiguous", our supreme court has held: "The term 'willful and wanton' includes a range of mental states from actual or deliberate intent to cause harm, to utter indifference for the safety or property of others, to conscious disregard of the safety of others or their property." *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 235 (2007). We think it is obvious that such conduct denotes a mental state beyond mere "negligence."

¶ 68 Elsewhere, in discussing the relationships between separate provisions of the Tort Immunity Act, *Murray* acknowledged that willful and wanton is different from merely negligent conduct. *Id.* at 230 (2007) (discussing application of sections 2-101, 2-109, and 3-108(a), "This court has held that these provisions, when applicable, provide immunity from *both negligent, as well as willful and wanton conduct.* [Citations.]).

¶ 69 Other decisions of our supreme court have emphasized that willful and wanton conduct goes *beyond* mere negligence. *Jane Doe-3 v. McLean County Unit Dist. No. 5 Bd. of Directors*, 2012 IL 112479, ¶ 29 ("Willful and wanton conduct requires plaintiffs to plead and prove the elements of negligence—duty, breach, proximate causation, and damages—*as well as a deliberate intention to harm or a conscious disregard for plaintiffs' welfare*." (Emphasis added); *Ziarko*, 161 Ill. 2d at 75 ("Under the facts of one case, willful and wanton misconduct may be only degrees more than ordinary negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing." )

¶ 70 These authorities solidify the distinction between actions based on negligence and claims of willful and wanton conduct. We thus hold that the plain language of section 2-1117, which

references actions "based on negligence," does not encompass claims for willful and wanton conduct.

¶ 71 Although not necessary to our conclusion, our view is consistent with the analysis in *Ready*, 232 Ill. 2d 369, which our supreme court addressed a different question as to the interpretation of section 2-1117. In *Ready*, a wrongful death plaintiff reached settlement agreements with two defendants but proceeded to trial against a third defendant, United. *Id*. at 372. The trial court denied United's motion to list the two settling parties on the verdict form, so as to allow the jury to allocate some portion of fault to those parties. *Id*. at 373. On appeal, United argued that if the jury had been asked to consider the other parties' fault, "its share of fault might have been set as less than 25%, and, under section 2-1117, United would have been only severally liable." *Id*. at 373.

¶ 72 Our supreme court proceeded to consider "whether settled tortfeasors are 'defendants sued by the plaintiff' within the meaning of section 2-1117." *Id*. at 374. Our supreme court found that section 2-1117's phrase "defendants sued by the plaintiff" was "ambiguous with respect to whether it includes withing its scope settling tortfeasors." *Id*. at 378. Turning to consider tools of statutory construction, our supreme court noted that when legislature amended the statute in 2003, the amendment did not address a prior Appellate Court decision holding that settling defendants were *not* to be included in the apportionment of fault. *Id*. at 380 (citing *Blake v. Hy Ho Restaurant, Inc*., 273 Ill. App. 3d 372 (1995)). This indicated the "legislature's acceptance" of that judicial interpretation. *Id*.

¶ 73 Our supreme court also agreed with plaintiff that amendments to section 2-1116 of the Code in the Public Act 89-7, the "Tort Reform Act of 1995", indicated that "settling defendants were not meant to be included in the apportionment of fault" under section 2-1117. *Id*. at 382.

Specifically, our supreme court noted that Public Act 89-7 sought to amend section 2-1116(b)'s definition of a "tortfeasor" to include "any person, excluding the injured person, whose fault is a proximate cause of the [injury] for which recovery is sought *** *regardless of whether that person may have settled with the plaintiff*." *Ready*, 232 Ill. 2d at 380-81 (quoting 735 ILCS 5/2-1116(b) (West 1996). The *Ready* plaintiffs argued that this amendment indicated the legislature's recognition "that settling tortfeasors were not originally included in the apportionment of fault" under the original version of section 2-1117. *Id*. at 381.

¶ 74    Although our supreme court in *Ready* acknowledged that Public Act 89-7 was subsequently held unconstitutional in *Best v. Taylor Machine Works*, 179 Ill. 2d 367 (1997), it nonetheless agreed that the amendments were relevant to indicate legislative intent. 232 Ill. 2d at 381. Thus it agreed with plaintiff "that the 1995 amendments are a compelling indication that settling defendants were not meant to be included in the apportionment of fault" under the prior version of the statute. *Id*. at 382.  Our supreme court proceeded to conclude that "section 2-1117 does not apply to good-faith settling tortfeasors who have been dismissed from the lawsuit." *Id*. at 385.

¶ 75    We recognize that *Ready* faced a different question than the instant case, as it was directed to *settling* defendants. Here, Wofford was dismissed by plaintiff, but he was not a settling defendant. Nonetheless, *Ready*'s analysis of the 1995 amendments to section 2-1116 is instructive on the instant question before us. As plaintiff pointed out at oral argument, Public Act 89-7 amended section 2-1116 to define "Fault" to mean "any act or omission that (i) is *negligent, willful and wanton, or reckless*, is a breach of an express or implied warranty, gives rise to strict liability in tort, or gives rise to liability under the provisions of any State statute, rule or local ordinance and (ii) is a proximate cause of death, bodily injury to person, or physical damage to

property for which recovery is sought." (Emphasis added). P.A. 89-7. Thus, the amended text distinguished between "negligent" and "willful and wanton" or "reckless" conduct. We recognize that Public Act 89-7 was held unconstitutional in *Best*, such that its amendments to section 2-1116 were invalidated. *Ready*, 232 Ill. 2d at 381. Nonetheless, as discussed in *Ready*, such amendments are still indicative of legislative intent. *Id*. at 382. Analogous to the discussion in *Ready,* we think the amendment indicated the legislature's understanding that actions based on negligence are separate from "willful and wanton" conduct. In turn, this further supports our conclusion that the statutory phrase "based on negligence," as used in section 2-1117, does *not* encompass willful and wanton conduct.

¶ 76    We note that we are not persuaded by the City's reliance on precedent discussing the phrase "based on negligence," within section 2-604.1 of the Code of Civil Procedure, which states: "In all actions on account of bodily injury or physical damage to property, based on negligence *** where punitive damages are permitted no complaint shall be filed containing a prayer for relief seeking punitive damages." 735 ILCS 5/2-604.1 (West 2024). Our supreme court,  in a footnote, stated: "As used in this provision, 'negligence' refers generically to all types of unintentional, non-strict liability torts, including willful and wanton misconduct."  (Emphasis added). *Vincent v. Alden-Park Strathmoor, Inc*., 241 Ill. 2d 495, 499 n. 1. (citing *Stojkovich v. Monadnock Building*, 281 Ill. App. 3d 733, 741 (1996)).

¶ 77    The City urges that the *Vincent* footnote supports an interpretation that the "based on negligence" phrase used in section 2-1117 encompasses willful and wanton conduct. We disagree. The *Vincent* footnote is explicit that it merely refers to the meaning of negligence "*As used in this provision*," that is, section 2-604.1 of the Code regarding punitive damages.  241 Ill. 2d 495, 499 n. 1. (Emphasis added.) Nothing in the footnote purports to comment on the

meaning of "negligence" in any other Code provision. The same is true of the appellate court decision cited in that footnote. See *Stojkovich*, 281 Ill. App. 3d at 741 (discussing section 2-604.1 in reviewing denial of plaintiff's motion for leave to file an amended complaint seeking punitive damages for willful and wanton misconduct). Notably, *Stojkovich* reasoned that "negligence" as used in that statute must be construed to include willful and wanton misconduct because it did not believe the legislature "intended to expand the availability of punitive damages to tort actions based on a theory of simple negligence." *Id.* at 741-42 (such a finding would be contrary to "well-settled rule that punitive damages are not awarded for acts of ordinary negligence." ). Thus, *Stojkovich* actually confirms the distinction between mere negligence and willful and wanton conduct.

¶ 78    For the above reasons, we agree with the trial court that plaintiff's willful and wanton claim against the City was not a claim "based on negligence" subject to apportionment under section 2-1117. Thus, the trial court correctly denied the City's request to ask the jury to apportion fault between Wofford and the City pursuant to that statute.

¶ 79    The Trial Court Did Not Err in Deciding the Contribution Claim After Wofford Was

Defaulted

¶ 80    We proceed to address the City's claim that the trial court erred in deciding the contribution counterclaim against Wofford, without a jury. Specifically, the trial court found that, based on the evidence it heard at the jury trial, the City and Wofford were each 50% responsible. Notably, the City had already defaulted Wofford on the contribution counterclaim. Yet, the City urges that a jury should still have made the determination as to his level of responsibility, for purposes of the contribution claim.

¶ 81    As the parties acknowledged at oral argument, this appears to be a question of first impression. We have not found any case law addressing this particular situation. Nonetheless – especially given our prior conclusion that section 2-117 did not apply – we find the City's claim unavailing.

¶ 82    Notably, the City's argument on the contribution claim relies largely on section 2-1117, insofar as that statute calls for apportionment of fault "as determined by the trier of fact." However, we have determined that section 2-1117 did not apply to the willful and wanton claim against the City. More fundamentally, even if *arguendo* section 2-1117 applied to the initial assessment of liability owed to plaintiff, a claim for contribution is a subsequent, distinct procedure governed by a different statute, the Contribution Act. See *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64, 80-82 (2002); 740 ILCS 100/1 *et seq.* (West 2022).

¶ 83    A contribution claim is a "defendant's claim to recover part of his or her liability to a plaintiff from another defendant or some third party who, it is asserted, should share in the liability." *Victim A. v. Song*, 2021 IL App (1st) 200826, ¶17. "Contribution concerns only the rights of joint tortfeasors relative to each other and does not eliminate their liability for the plaintiff's judgment." *Id.*

¶ 84    The Contribution Act provides that "[w]here 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has not been entered again any or all of them." 740 ILCS 100/2(a) (West 2022). "The right to contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability, and his total recovery is limited to the amount paid by him in excess of his pro rata share." *Id.* § 2(b).  Here,

the trial court (rather than a jury) decided that the City and Wofford each had 50 percent pro rata share.

¶ 85    We emphasize that the City's contribution claim against Wofford is wholly separate from the earlier question of application of section 2-1117 to plaintiff's claim. Our supreme court clarified that section 2-1117 concerns apportionment of liability owed directly to plaintiff; thus it "comes into play before the Contribution Act." *Unzicker*, 203 Ill. 2d at 80 (explaining that section 2-1117's modification of the rule of joint and several liability does not conflict with the Contribution Act, by which "Any defendant who pays damages in an amount greater than his or her pro rata share of fault can then seek contribution.") Thus, insofar as the City urges that the trial court's decision to apportion the pro rata share of fault on the contribution claim ran afoul of section 2-1117, that argument is without merit. Section 2-1117 does not govern a claim for contribution.

¶ 86    The City otherwise urges that the trial court's decision to rule on the contribution claim was error because it made a jury demand when it same time it filed its answer and counterclaim. On this point, plaintiff counters that since the City had already obtained a default order against Wofford, "there was nothing left for the jury to decide after its verdict."

¶ 87    As the parties acknowledged at oral argument, apparently there is no direct precedent as to whether the default order permitted the trial court to decide the contribution claim, notwithstanding the City's jury demand. Indeed, the record reflects that the trial court repeatedly invited the parties to supply any governing authority.

¶ 88    The City cites our supreme court's statement that "one jury should decide both the liability to the plaintiff and the apportionment of that liability among the named defendants and other parties." *Harshman v. DePhillips*, 218 Ill. 2d 482, 491 (2006). However, that decision did

not purport to discuss any right to a jury to decide a contribution claim, especially where there has been a default order. Rather, *Harshman* was concerned with whether section 5 of the Contribution Act (740 ILCS 100/5 (West 1992)) permitted a party to file a contribution claim outside the original action. The statement cited by the City merely reflected the court's recognition that, as a matter of judicial economy, it is preferable for the same fact finder to decide liability and the apportion of that liability. *Harshman*, 218 Ill. 2d at 491 ("Requiring parties to litigate these matters in one suit *** minimizes docket crowding, avoids inconsistent verdicts , and limits the accumulation of attorney fees. [Citation.]" We do not find *Harshman* indicates a preference for a jury to decide apportionment of liability after a defendant has been defaulted on the question of liability.

¶ 89     Plaintiff refers us to *Victim A*. *v*. *Song*, 2021 IL App (1st) 200826 as "instructive." The plaintiff in *Victim A* brought an emotional distress action against defendant Song and obtained a $300,000 judgment on a jury verdict. Song brought a third-party complaint for contribution against a co-tortfeasor, Harper. After Song was found liable to plaintiff, "he presented a motion for prove-up of his contribution action," and the trial judge entered a finding that Harper was 90% at fault and Song was 10% at fault. *Id*. ¶ 3. Song unsuccessfully contended that "the 90%-10% ruling in his contribution action brought his liability *** under the 25% threshold for several liability set out in section 2-1117." *Id*. ¶ 5. Our court disagreed, explaining that (1) section 2-1117 was inapplicable to the underlying emotional distress action and (2) the ruling in his contribution claim did not reduce his liability to Victim A. *Id*. at ¶¶ 9-17.

¶ 90     Plaintiff points out that in *Victim A*., Song did not take issue with the fact that the trial court (rather than a jury) decided the proportion of fault on his contribution claim. However, the

opinion simply did not contain any discussion as to whether this was proper. Moreover, nothing in *Victim A.* suggests that there was a jury demand in the contribution action.

¶ 91    Although not cited by the parties, we find a 1997 case from this court is somewhat helpful, but not exactly on point. See *Orejel v. York International Corp., Inc*., 287 Ill. App. 3d 592. (1997). *Orejel* stemmed from an underlying wrongful death action brought against various defendants after a furnace caused carbon monoxide poisoning. One of the defendants, York, filed counterclaims seeking contribution from the other named defendants and filed a third-party complaint against a utility company. *Id* at 595. York entered into a settlement agreement with plaintiff under which it agreed to pay $10 million in settlement of plaintiff's claims against all defendants and third-party defendants; however, York retained the right to pursue its right of contribution against  other parties. *Id*. at 596-97. The settlement was contingent upon the entry of a final order finding the settlement was made in good faith pursuant to the Contribution Act. *Id.* at 597; see also 740 ILCS 100/2(c), (d) (where a tortfeasor has entered into a "good faith" settlement, that tortfeasor "is discharged from all liability for any contribution to any other tortfeasor.")

¶ 92    When York sought a good-faith finding in the circuit court, certain codefendants objected on the grounds that "their right to a trial by jury required that a jury, rather than the trial court, determine whether the settlement was entered in good faith and was reasonable in its amount." *Id*. The trial court found that the $10 million settlement figure was reasonable and that the codefendants did not have a right to a jury trial to determine the amount of the damages. Id.

¶ 93    On appeal, our court rejected the codefendants' claim that they had a constitutional right to have a jury determine whether the $10 million settlement was made in good faith and was

reasonable. The court noted that "the Contribution Act is a new statutory right created by the legislature and, as such, does not confer the right to a jury trial. [Citation]" *Id*. at 602.

¶ 94   Significant to this appeal, our court explained:

"In a contribution action, the settlement amount or 'common liability' is deemed to be the amount against which the jury's determination of liability will be factored. In a contribution trial, therefore, *the jury will only decide whether the contribution defendant is liable and, if so, by what percentage of the common liability*." (Emphasis added.) *Id*.

Thus, while *Orejel* found there is no right to have a jury indicate the total common liability to be divided among contribution defendants, it indicated that a jury should determine "whether the contribution defendant is liable, and if so," the percentage of the common liability attributed to each contribution defendant. *Id*.

¶ 95   *Orejel* is distinguishable from the instant situation in a key respect: the City already defaulted Wofford, foreclosing any issue of fact as to his liability. Thus, there was no need for a jury to determine whether Wofford was liable. The only question remaining was the relative share of the common liability owed by each of the City and Wofford.

¶ 96   We acknowledge the lack of governing case law on this precise situation. But in our view, the City's claim that it was entitled to have a jury assess Wofford's relative fault is incompatible with its strategic decision to default Wofford with respect to its contribution claim. In doing so, the City effectively waived its jury demand. Moreover, as noted at oral argument, it is difficult to imagine how it would be practical or fair to conduct a jury proceeding on the

relative share of responsibility between the City and a defaulted, incarcerated defendant such as Wofford, who could not participate.

¶ 97    For these reasons, we reject the City's claim of error in the trial court' decision to assess the relative responsibility between the City and Wofford with respect to the City's contribution counterclaim.

¶ 98      The Court Erred in Finding a Judicial Admission But This Was Not Prejudicial

¶ 99    We turn to address the City's contention that the trial court erred in concluding that Ramirez's testimony constituted a judicial admission that the pursuit violated section 3 of the General Order. We find that Ramirez's deposition testimony—considered as a whole—did not give rise to a judicial admission. However, we cannot say the City suffered prejudice from this error. Thus, it is not grounds for reversal.

¶ 100   "A judicial admission is a deliberate, clear, unequivocal statement by a party concerning a concrete fact within the party's knowledge." *In re Estate of Ivy*, 2019 IL App (1st) 181691, ¶ 64. "A judicial admission conclusively binds a party and bars a party making the admission from controverting it." *Johnson v. Advocate Health and Hospitals Corp*., 2025 IL App (1st) 230087, ¶ 35.

¶ 101   "In order for testimony to be binding, it must be peculiarly within the knowledge of the deponent" and "the witness must be in a position to know the fact about which he is testifying." *Ivy*, 2019 IL App (1st) 181691, ¶ 65. "Judicial admissions only apply when a party's testimony, taken as a whole, is unequivocal." *Id*. (citing *Dunning v. Dynegy Midwest Generation, Inc*., 2015 IL App (5th) 140168, ¶ 50). "When analyzing whether testimony is equivocal, the court must consider the whole testimony, as the determination depends on an evaluation of all the testimony not just a part of it." *Id*.; see also *Johnson v. Advocate Health and Hospitals Corp*., 2025 IL App

(1st) 230087, ¶ 35 (in assessing whether attorney's closing argument contained a judicial admission, courts should consider the entirety of closing argument).

¶ 102    We note there is conflicting case law as to the standard of review in deciding whether the trial court should have treated a statement as a judicial admission, with some courts reviewing the issue de novo and others asking whether there was an abuse of discretion. See *Crittenden v. Cook County Commission on Human Rights*, 2012 IL App (1st) 112437, ¶ 46 (recognizing there are "two lines of cases concerning the proper standard of review."). We need not attempt to decide which standard applies; under either standard, we find the court erred in holding that there was judicial admission.

¶ 103    Here, the purported admission came within the following colloquy between plaintiff's counsel and Ramirez:

> Q. *** You just said that this policy allows officers to pursue for DUI. And what I'm wondering is, does that mean what you're saying is that this general order does not prohibit the pursuit of a DUI suspect in certain circumstances?
>
> A. In certain circumstances; correct.
>
> Q. What about in an unmarked car? Isn't that prohibited?
>
> A. For a DUI?
>
> Q. Yes.
>
> A. I would consider DUI more than just a traffic offense. I would –
>
> Q. You consider it more than a traffic offense, but does the general order consider it more than a traffic offense?

A. I guess if you go by what's in Title IX – I don't know if that's what the meaning of the order is meant to be. I – I think that's one of the reasons why they changed the order in 2019, to be more specific about it.

Q. Okay. But based on the plain language of this order that was in effect on this day, pursuing in an unmarked vehicle for DUI was prohibited, correct?

A. I'm sorry. Based on No. 3, strictly speaking, yes."

¶ 104   In this case, the trial court agreed with plaintiff that Ramirez's "strictly speaking, yes" answer was a judicial admission that a pursuit for DUI by an unmarked police car violated the General Order. For two reasons, we do not find this was a judicial admission. First, we agree with the City that the topic of the question was not one of "concrete fact." Rather, he was being asked to interpret the language of a Chicago Police Department policy. We do not see how this can be construed as a concrete fact; it was more akin to a question of law. See *Johnson v. O'Connor*, 2018 IL App (1st) 171930, ¶ 16 (interpretation of a Chicago Police Department Special Order concerning grounds for disqualification was a question of law).

¶ 105   Moreover—keeping in mind that we must consider the testimony as a whole—it cannot be said that Ramirez's testimony on this topic was unequivocal. To the contrary, he gave equivocal and inconsistent testimony. Indeed, almost immediately before his "strictly speaking" answer, Ramirez indicated his belief that pursuit for a DUI was permissible because it was more than a traffic offense. And when asked the follow-up "does the general order consider it more than a traffic offense," he said **"*I don't know if that's what the meaning of the order is meant to be*.**" (Emphasis added). We think it is apparent that Ramirez's testimony on this topic was

equivocal. It was far from the clear, deliberate statement required to constitute a judicial admission.

¶ 106    Thus, we conclude the trial court erred in permitting the plaintiff to present Ramirez's testimony as a judicial admission. Our analysis cannot end there, as we recognize that only prejudicial error is reversible. See *North Spaulding Condominium Ass'n v. Cavanaugh*, 2017 IL App (1st) 160870, ¶ 30 (error in an evidentiary ruling is not grounds for reversal unless it is "substantially prejudicial and affected the outcome of the case.").

¶ 107    Here, we cannot say that the error with respect to the judicial admission caused substantial prejudice that affected the outcome of the case. Although plaintiff's counsel repeatedly referred to the purported judicial admission in Ramirez's testimony, it offered substantial independent evidence from which the jury could conclude that the pursuit did not comply with the general order. In this regard, we find it particularly significant that in his testimony, the pursuing officer (Menkovic) agreed when asked that "the chase should have never started under the prohibitions in the General Order." Moreover, plaintiff's expert witness opined that the officers should not have engaged in the pursuit because CPD policy "prohibits pursuit by unmarked vehicles for traffic violations." Thus, even without reference to Ramirez's deposition testimony, the jury could conclude that the pursuit was prohibited by the General Order. We also note the uncontradicted testimony that the officers failed to contact OEMC during the pursuit, which was plainly in violation of the General Order. In turn, we cannot say that the error with respect to the purported judicial admission caused substantial prejudice.

¶ 108        The Court Did Not Err in Barring Evidence that Wofford's Car Was Stolen

¶ 109    Before we conclude, we briefly note but reject the City's final contention, that the trial court erred in barring the jury from hearing evidence that Wofford was driving a stolen vehicle.

The admission of evidence is within the sound discretion of the trial court, and its decision will not be reversed absent an abuse of discretion. *McHale v. W.D. Trucking*, 2015 IL App (1st) 132625, ¶ 28. An abuse of discretion occurs if the ruling is "arbitrary, fanciful or unreasonable or where no reasonable person" would take the same view. *Id.*

¶ 110   Only relevant evidence is admissible. Ill. R. Evid. 402. (eff. Jan. 1, 2011). Here, the record reflects the trial court's conclusion that, insofar as the pursuing officers did not know that the vehicle was stolen, it was not relevant to plaintiff's claim that their decision to pursue Wofford was willful and wanton. The City cites no case law suggesting otherwise. We find that the trial court's ruling on this point was entirely reasonable and not an abuse of discretion.

¶ 111                                  CONCLUSION

¶ 112   In conclusion, we find that the trial court correctly determined that section 2-1117 did not apply to plaintiff's claim against the City, and thus correctly declined to ask the jury to apportion fault between the City and Wofford. We also decline to find that the trial court erred in deciding the contribution claim without a jury, given that Wofford had already been defaulted. Although the trial court erred in construing Ramirez's deposition testimony as a judicial admission, that was not reversible error.

¶ 113   For the foregoing reasons, we affirm the judgment of the Circuit Court of Cook County.

¶ 114   Affirmed.